571 A.2d 1227

**STATE of Maryland**

**v.**

**Randall Paul EARP.**

**No. 103, Sept. Term, 1988.**

Court of Appeals of Maryland.

April 10, 1990.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for petitioner and cross-respondent.

John L. Kopolow, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for respondent and cross-petitioner.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL *, JJ.

McAULIFFE, Judge.

In this case we hold that an indispensable element of the crime of attempted murder is a specific intent to murder. We also hold that the trial judge did not abuse his discretion when he permitted testimony by witnesses who, prior to trial, had been shown a videotape recording of the victim's deposition testimony.

## I.

### *Facts*

This case grows out of a melee that occurred in Montgomery County on the evening of 31 October 1985. The victim, Michael Dwayne Lawrence, was attending a Halloween party, together with more than 100 other people. When word spread that someone had been struck by a pick-up truck just outside the place where the party was being held, many of the persons in attendance, including Lawrence, went to the scene.

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

Lawrence testified[1] to the subsequent events as follows. When he arrived outside, he observed 40 or 50 people engaged in fights. Other people were attacking the truck with sticks, pipes, and shovels, breaking the headlights and attempting to get to the two occupants. Lawrence knew the passenger in the truck, and advised him to flee. Lawrence then questioned the driver, and upon learning that the driver had struck the pedestrian, Lawrence held him against the truck. At this point, while police officers were making their way through the crowd toward the truck, Randall Paul Earp grabbed Lawrence by the shoulder, attempted to hit the driver of the truck, and said, "let me have a piece of him." Lawrence told Earp that only the police were "going to get something from him." Earp responded with, "some slang words" and said, "well, I'll take a piece of you." Lawrence then felt a punch in his back, and looking over his shoulder saw a knife handle protruding from his back. He felt the knife being pulled down and saw it being withdrawn. Earp then lunged at Lawrence a second time, and as Lawrence was attempting to defend himself, he was cut on the thumb. Lawrence said Earp attempted "about 10 to 15 slices," but Lawrence was able to block most of them. Earp ran when the police officers reached the truck.

Other witnesses confirmed the attack by Earp on Lawrence, and the essential nature of the conversation between them. One witness described the knife used by Earp as a "Buck 110," having a blade three to four inches long.

A doctor who treated Lawrence at the hospital described the stab wounds to the right shoulder and left thumb. He said the shoulder wound was three centimeters long and six centimeters deep, and that only the protection afforded by the shoulder blade had prevented deeper penetration. The doctor further testified that if the stab wound had extended into the chest cavity, it would have created a potential for

---

**1.** Lawrence died of cancer before trial. His testimony was given by videotape deposition taken pursuant to Maryland Rule 4–261.

hemorrhaging which, if not stanched, could have been fatal. The wounds actually incurred were not life threatening.

Earp was indicted on charges of attempted murder in the first and second degrees; assault with intent to murder; assault with intent to maim, disfigure, or disable; and battery. His first trial in the Circuit Court for Montgomery County ended in a mistrial when the jurors were unable to agree on a verdict. Earp then waived his right to trial by jury, and was re-tried before Judge Paul H. Weinstein. The State elected to proceed only on the counts charging attempted murder and assault with intent to maim, disfigure, or disable, and entered a *nolle prosequi* to the remaining counts.

Judge Weinstein found Earp guilty of attempted murder in the second degree and assault with intent to maim, and imposed concurrent sentences of imprisonment of 25 years and 9 years respectively. Earp appealed to the Court of Special Appeals. That court reversed the conviction of attempted murder in the second degree, but affirmed the conviction of assault with intent to maim. *Earp v. State*, 76 Md.App. 433, 545 A.2d 698 (1988). We affirm that judgment.

## II.

### *The Intent Element of Attempted Murder*

Two questions arise concerning the element of intent in the attempted murder prosecution. First, what was the trial judge's finding concerning Earp's intent? Second, if the trial judge found an intent to inflict grievous bodily harm, but not an intent to murder, would that be sufficient to support a finding of attempted murder in the second degree?

With respect to the first question, we agree with the majority of the Court of Special Appeals panel that the trial judge grounded his decision upon a finding that Earp intended to inflict serious bodily harm, and that the trial judge did not find that Earp harbored an intent to murder.

The relevant colloquy between the attorneys and the trial judge, and the trial judge's statements concerning the defendant's involvement, are set forth in the opinion of the Court of Special Appeals, 76 Md.App. at 440–43, 545 A.2d at 702–03, and need not be repeated here. We agree with the State that the evidence was sufficient to have permitted a finding of an intent to murder. We think it clear, however, that the trial judge did not make that finding, but instead concluded that Earp's intention was only to inflict grievous bodily harm.

Concerning the second question, we believe it is equally clear that the trial judge accepted the argument of the assistant state's attorney that because an intent to inflict grievous bodily harm is one of the several malevolent states of mind that will support a conviction for murder in the second degree when death results, it should be sufficient to support a conviction of attempted murder in the second degree when the victim does not die. It is true that a specific intent to kill is not an indispensable element of *murder* in the second degree. As we said in *Ross v. State*, 308 Md. 337, 340, 519 A.2d 735 (1987):

> Murder is the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation. These qualifying malevolent states of mind are: 1) the intent to kill, 2) the intent to do grievous bodily harm, 3) the intent to do an act under circumstances manifesting extreme indifference to the value of human life (depraved heart), or 4) the intent to commit a dangerous felony. (Footnotes omitted).

The question here is whether an intent to do grievous bodily harm, which satisfies the *mens rea* element in a consummated murder, suffices for a conviction of attempted murder when death does not result.

The crime of attempt consists of a specific intent to commit a particular offense coupled with some overt act in furtherance of the intent that goes beyond mere preparation. *Bruce v. State*, 317 Md. 642, 646, 566 A.2d 103 (1989);

*State v. Wilson,* 313 Md. 600, 604–05, 546 A.2d 1041 (1988); *Cox v. State,* 311 Md. 326, 330, 534 A.2d 1333 (1988); *Young v. State,* 303 Md. 298, 303–06, 493 A.2d 352 (1985). One may be guilty of an attempted murder in the first or second degree, *State v. Holmes,* 310 Md. 260, 268, 528 A.2d 1279 (1987), *Hardy v. State,* 301 Md. 124, 139–40, 482 A.2d 474 (1984), or of an attempted voluntary manslaughter, *Cox v. State, supra,* 311 Md. at 334, 534 A.2d 1333. The specific intent that is required may be a "transferred" intent, that is, the *mens rea* of a defendant as to his intended victim will be transferred to an unintended victim who suffers injury as a result of the defendant's attempt. *State v. Wilson, supra,* 313 Md. at 609, 546 A.2d 1041.

The specific intent required to prove an attempt is the intent to commit a particular crime, in this case murder. Accordingly, the required specific intent in the crime of attempted murder is a specific intent to murder. It must be kept in mind that an "intent to murder" is not the same as an "intent to kill." The former includes the latter, but the reverse is not true. "Intent to kill" means just what the term suggests—one person intends to bring about the death of another. The harboring of this intent may be entirely without culpability in the eyes of the law, as when a soldier intends to kill his adversary in time of war, or an innocent person intends to kill another to save himself from an unprovoked attempt on his life. Or, the harboring of the intent to kill may be culpable but mitigated, as where the intent to kill proceeds from a hot-blooded reaction to an adequate provocation.

Or, the intent to kill may satisfy the *mens rea* element of murder or attempted murder, as when it exists in the absence of legally adequate justification, excuse, or mitigation. It is then, in the truest sense, an intent to murder.

Our cases have sometimes used the terms "intent to kill" and "intent to murder" interchangeably. In most instances, the meaning is clear and the mixing of terms

poses no real possibility of misunderstanding. Where, for example, evidence fails to generate any question of justification, excuse or mitigation, both terms are used to reflect an intent to kill. A word of caution is in order, however, particularly in the matter of instructing juries. A familiar instruction informs the jury that an intent to kill may be inferred from the use of a dangerous or deadly weapon directed at a vital part of the body. That is true; but if the jury is instructed that an intent to *murder* may be inferred from such use of a deadly weapon, the instruction may be erroneous. If the jury has been instructed that intent to murder means intent to kill plus the absence of justification, excuse or mitigation, which indeed it does, the jury might understand from the instruction that the absence of justification, excuse, or mitigation could be inferred from the use of a deadly weapon directed at a vital part of the body, and that is clearly incorrect. *See Glenn v. State*, 68 Md.App. 379, 404–05, 511 A.2d 1110, *cert. denied*, 307 Md. 599, 516 A.2d 569 (1986). The better practice, particularly in a case involving a legal issue of justification, excuse, or mitigation, would be to instruct the jury that the attempt must be accompanied by a specific intent to kill *and* must occur under circumstances that would not legally justify or excuse the killing or mitigate it to manslaughter if death should result.

The State, although agreeing that an intent to murder may consist of an intent to kill and the absence of justification, excuse, or mitigation, argues that an intent to commit grievous bodily harm will serve as a substitute for an intent to kill, as it does in the case of second degree murder. We do not agree. We hold, instead, that where an attempted murder is charged, the State must show a specific intent to kill—an intent to commit grievous bodily harm will not suffice. In addition, of course, the State must prove an attempt, and, where the evidence fairly generates the issue, the absence of justification, excuse, or mitigation.

Our holding today is consistent with our determination in *State v. Jenkins*, 307 Md. 501, 510–15, 515 A.2d 465 (1986),

that a specific intent to murder is an indispensable element of the crime of assault with intent to murder.[2] We said in *Jenkins* that the clear language of the statute makes an intent to murder a critical element of that offense. *Id.* at 510, 515 A.2d 465.

From what we have said of the common law of the offense of attempt, it is equally clear that an attempted murder is an attempt, manifested by an overt act, coupled with a specific intent to commit murder, i.e., an attempt with intent to murder. The analysis of *Jenkins* therefore applies with equal force here, and we reach the same conclusion.

Our holding on this point is in accordance with the nearly unanimous view of the authors of respected treatises in the criminal law field. One commentator suggests:

> Some crimes, such as murder, are defined in terms of acts causing a particular result plus some mental state which need not be an intent to bring about that result. Thus, if *A, B,* and *C* have each taken the life of another, *A* acting with intent to kill, *B* with an intent to do serious bodily injury, and *C* with a reckless disregard of human life, all three are guilty of murder because the crime of murder is defined in such a way that any one of these mental states will suffice. However, if the victims do not die from their injuries, then only *A* is guilty of attempted murder; *on a charge of attempted murder it is not sufficient to show that the defendant intended to do serious bodily harm* or that he acted in reckless disregard for human life. Again, this is because intent is needed for the crime of attempt, so that attempted murder requires an intent to bring about that result described by the crime of murder (i.e., the death of another).

LaFave & Scott, *Handbook on Criminal Law,* § 59 (1972) (footnotes omitted) (emphasis supplied). *See also* 1 *Bishop*

---

**2.** The Court of Special Appeals reached the same conclusion in *Glenn v. State,* 68 Md.App. 379, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986).

*on Criminal Law,* § 730 (9th ed. 1923) ("[t]o commit murder, one need not intend to take life; but to be guilty of an attempt to murder, he must so intend"); Clark & Marshall, *A Treatise on the Law of Crimes,* § 4.08 (7th ed. 1967) ("[t]o constitute an attempt to murder, specific intent to kill is necessary, and an intent to commit any other crime will not suffice"); Perkins & Boyce, *Criminal Law,* 637–38 (3rd ed. 1982) ("while a person may be guilty of murder though there was no actual intent to kill, he cannot be guilty of an attempt to commit murder unless he has a specific intent to kill"); 1 *Warren on Homicide,* § 81 (permanent ed. 1939) ("to constitute an attempt to commit murder one must specifically contemplate taking someone's life"); 4 *Wharton's Criminal Law,* § 743 (14th ed. 1981) ("[a]lthough a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill").

The overwhelming majority of state courts that have considered this issue also have reached the same conclusion. *See People v. Lee,* 43 Cal.3d 666, 238 Cal.Rptr. 406, 738 P.2d 752, 754 (1987); *People v. Harris,* 72 Ill.2d 16, 17 Ill.Dec. 838, 377 N.E.2d 28, 31–33 (1978); *Pearson v. State,* 523 N.E.2d 747, 749 (Ind.1988); *State v. Strother,* 362 So.2d 508, 509 (La.1978); *State v. Keefe,* 553 A.2d 1253 (Me.1989); *Com. v. Maloney,* 399 Mass. 785, 506 N.E.2d 1147, 1149 (1987); *State v. Dahlstrom,* 276 Minn. 301, 150 N.W.2d 53, 58–59 (1967); *Ramos v. State,* 95 Nev. 251, 592 P.2d 950, 951 (1979); *State v. Lyerla,* 424 N.W.2d 908, 912 (S.D.1988); *State v. Maestas,* 652 P.2d 903, 904–05 (Utah 1982); *Merritt v. Commonwealth,* 164 Va. 653, 180 S.E. 395, 398–99 (1935); *State v. Schenk,* 53 Wis.2d 327, 193 N.W.2d 26, 29 (1972); *Free v. State,* 455 So.2d 137, 147 (Ala.Cr.App.1984); *Huitt v. State,* 678 P.2d 415, 419–20 (Alaska App.1984); *Littles v. State,* 384 So.2d 744 (Fla.App.1980); *State v. Johnson,* 103 N.M. 364, 707 P.2d 1174, 1178–79 (App.1985); *State v. Smith,* 21 Or.App. 270, 534 P.2d 1180, 1184 (1975); *Com. v. Griffin,* 310 Pa.Super. 39, 456 A.2d 171, 177–78 (1983);

*Flanagan v. State,* 675 S.W.2d 734, 741–42 (Tex.Cr.App. 1984).

█ The required intent to kill, may, of course, be proved by circumstantial evidence—that is, the trier of fact may infer the existence of the required intent from the surrounding circumstances.

> [S]ince intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence.

*Davis v. State,* 204 Md. 44, 51, 102 A.2d 816 (1954). An intent to kill may, under proper circumstances, be inferred from the use of a deadly weapon directed at a vital part of the human body. *State v. Jenkins, supra,* 307 Md. at 514, 515 A.2d 465. Thus, while the inflicting of grievous bodily harm may be sufficient to permit the trier of fact to infer an intent to kill, unless that inference is actually drawn, the required *mens rea* has not been found.

█ In summary, there is a difference between the intent that will suffice to prove a consumated murder, and that which is required when death does not result. The required intent in the crimes of assault with intent to murder and attempted murder is the specific intent to murder, i.e., the specific intent to kill under circumstances that would not legally justify or excuse the killing or mitigate it to manslaughter. The requisite intent to kill may, under appropriate circumstances, be inferred.

█ From the evidence before him in the instant case, the trial judge could have found that Earp harbored a specific intent to kill Lawrence. As we have earlier indicated, however, he did not draw that inference. His decision was based upon his finding that Earp had an intent to do grievous bodily harm, and upon the erroneous belief that this intent alone was sufficient to support a conviction on the charge of attempted murder in the second degree. Accordingly, that conviction must be reversed.

### III.

### *Showing Videotape Deposition To Witnesses*

■■■ Aware that Lawrence was dying of cancer, the State obtained an Order of Court authorizing the perpetuation of his testimony by videotape deposition. *See* Maryland Rules 4–261 and 2–416. The deposition was taken on 22 January 1986.[3] Thereafter, but before trial, the defendant filed a "Motion to Exclude Testimony of Witnesses" alleging that certain state's witnesses had been shown the videotape of Lawrence's testimony. Earp claimed that the showing of the deposition violated the provisions of Rule 2–416(i) (custody of videotape deposition) and Rule 4–321 (exclusion of witnesses). He also contended that allowing the testimony of the witnesses who had been influenced by the testimony of the victim would violate his constitutional guarantee of due process.[4]

It appears that the prosecutor showed all of the deposition of Lawrence to police officers Jacobs and Ehlers, and to Christine Garvin, Lawrence's fiancee. He showed part of the deposition to David Pagan, omitting the portion that depicted Lawrence selecting the defendant's picture from a photographic array. The prosecutor explained that he did not show Pagan the portion of the deposition in which Lawrence identified Earp because he knew that Pagan, who had seen the stabbing, would be asked to identify Earp during his testimony.

The defendant concedes that the trial judge's ruling cannot constitute reversible error as it pertains to his request

---

**3.** Lawrence died three weeks later.

**4.** The State argues that Earp did not preserve this question for appellate review because he did not object to the testimony of the affected witnesses at trial. *See Watson v. State,* 311 Md. 370, 372–73 n. 1, 530 A.2d 455 (1988) and *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988). We note that the State failed to preserve its argument of non-preservation by failing to raise the argument in the Court of Special Appeals. The Court of Special Appeals considered Earp's argument, and so shall we. *See* Rule 8–131(b)(1).

to exclude the testimony of Ehlers and Garvin, because Ehlers did not testify and Garvin had been present, without objection, when Lawrence gave his deposition testimony.

■ We consider first the defendant's contention that the prosecutor's action was in violation of Rule 2–416(i).[5] That rule provides:

> (i) **Custody.**—The attorney for the party taking the deposition or any other person designated by the court or agreed to by the parties represented at the deposition shall take custody of the videotape or audiotape and be responsible for its safeguarding, permit its viewing or hearing by a party or the deponent, and provide a copy of the videotape or its audio portion or of the audiotape, upon the request and at the cost of a party or the deponent....

Earp contends that because the rule expressly authorizes viewing of the deposition by the parties and the deponent, by negative implication it prohibits viewing by anyone else. We do not agree. Although the rule mandates that the custodian of the deposition tape *"shall"* permit its viewing by a party or the deponent, the rule adds nothing as to whom the custodian *may* allow to view the tape. In fact, the rule specifically requires that the custodian provide a party or the deponent with their own copy of the deposition, and imposes no limitation on the use that may be made of the copy. We therefore agree with the Court of Special Appeals that the prosecutor's use of the deposition did not violate Rule 2–416.

■ We also find unpersuasive Earp's argument that the showing of the deposition violated Rule 4–321. That rule deals with the exclusion of witnesses from a court proceeding, and is not applicable here. As we pointed out in *McCray v. State*, 305 Md. 126, 134, 501 A.2d 856 (1985),

---

5. Rule 2–416 is a rule of civil procedure. It applies here because it is incorporated by reference into the rule governing the taking of depositions in criminal cases. *See* Rule 4–261(e).

"the rule contemplates an order of sequestration before any sanction for a violation of the rule may be applied." No order of sequestration had been entered at the time this deposition was shown to the witnesses, and indeed it is doubtful that such an order would have been appropriate at that stage of the proceeding. Had the defendant wished to limit the showing of the deposition by court order, he could have sought a protective order pursuant to Rule 4–261(g)(5). He did not do so.

Finally, we find no merit in Earp's contention that by refusing to exclude the testimony of Jacobs and Pagan, the trial judge denied him due process of law. Under the particular circumstances of this case, we find no fault with the trial judge's decision. We do not wish to be understood, however, as endorsing the action of the prosecutor in showing the deposition to the prospective witnesses.

The question of just how far an attorney may go in preparing a witness for trial is a difficult one. It involves ethical considerations as well as the possibility of tainting a witness to the extent that due process and the necessity for reliable evidence may justify the exclusion of that witness's testimony.

Attorneys have not only the right but also the duty to fully investigate the case and to interview persons who may be witnesses. A prudent attorney will, whenever possible, meet with the witnesses he or she intends to call. The process of preparing a witness for trial, sometimes referred to as "horse-shedding the witness," [6] takes many forms, and

---

**6.** The term "horse-shedding the witness" is said to have been coined by James Fenimore Cooper. *See* G. Fowler, *The Great Mouthpiece: A Life Story of William J. Fallon* 93 (1931). Fowler wrote that there were carriage sheds near the courthouse in Cooper's day, where attorneys lingered to rehearse witnesses. James McElhaney, in *McElhaney's Trial Notebook* (2d ed. 1987), published by the Section of Litigation, American Bar Association, says that "good taste demands that [the term] be spoken with unusual precision, and it is often accompanied by a short explanation, just to make sure the listener did not misunderstand." Perhaps to avoid misunderstandings, others have referred to "woodshedding" a witness. *See, e.g.,* D. Acklin,

involves matters ranging from recommended attire to a review of the facts known by the witness. Because the line that exists between perfectly acceptable witness preparation on the one hand, and impermissible influencing of the witness on the other hand, may sometimes be fine and difficult to discern,[7] attorneys are well advised to heed the sage advice of the Supreme Court of Rhode Island:

> [I]n the interviews with and examination of witnesses, out of court, and before the trial of the case, the examiner, whoever he may be, layman or lawyer, must exercise the utmost care and caution to extract and not to inject information, and by all means to resist the temptation to influence or bias the testimony of the witnesses.

*State v. Papa*, 32 R.I. 453, 80 A. 12, 15 (1911).

It is permissible, in a pretrial meeting with a witness, to review statements, depositions, or prior testimony that a witness has given. It also may be necessary to test or refresh the recollection of the witness by reference to other facts of which the attorney has become aware during pretrial preparation, but in so doing the attorney should exercise great care to avoid suggesting to the witness what his or her testimony should be. In some instances, as in the case of an expert witness who will be asked to express an opinion based upon facts related by others, and who is not a factual witness whose testimony could be influenced by reading what others have said under oath, there is little danger in having the witness review the depositions of others. When, however, the testimony in the deposition

---

*Witness Preparation: Beyond the Woodshed,* 27 A.F.L. Rev. 21 (1987). Justice Frankfurter, in a concurring opinion in *Fikes v. State of Alabama,* 352 U.S. 191, 199, 77 S.Ct. 281, 285, 1 L.E.2d 246 (1957), refers to the "horse-shedding" of an accused during police interrogation. *See also United Steelworkers of America, Etc. v. Marshall,* 647 F.2d 1189, 1211 (D.C.Cir.1980); *Mastrian v. McManus,* 554 F.2d 813, 824 n. 23 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977).

**7.** *See* Note, *Professional Conduct and the Preparation of Witnesses for Trial: Defining the Acceptable Limitations of "Coaching",* 1 Geo. J. Legal Ethics 389 (1987).

bears directly on the facts that the reviewing witness will be asked to recount, and particularly when, as here, the testimony is known by the witness to be exactly that which will be used at trial, and is presented in its most graphic form by videotape, the potential for influencing the reviewing witness is great.

When there is evidence suggesting that a witness has been improperly influenced, the trial judge must decide whether the extraordinary action of excluding that witness's testimony at trial is required. Although a number of factors must be weighed in reaching that decision, the overriding consideration ordinarily will be whether the testimony in a particular case will likely be so unreliable that exclusion is justified. *C.f. Rock v. Arkansas*, 483 U.S. 44, 60, 107 S.Ct. 2704, 2714, 97 L.E.2d 37 (1987) (posthypnosis testimony may be so unreliable that exclusion is justified); *State v. Collins*, 296 Md. 670, 702–03, 464 A.2d 1028 (1983) (posthypnosis testimony admissible only if shown to be in accord with prehypnosis statements). Quite often, as was the case here, the trial judge will determine that disclosure through cross-examination of a witness concerning the pretrial activity that created the potential for influencing the witness's testimony will allow the trier of fact to adequately assess the witness's testimony. *See Geders v. United States*, 425 U.S. 80, 89–91, 96 S.Ct. 1330, 1335–36, 47 L.Ed.2d 592 (1976). The loss of the testimony of an otherwise competent witness carries with it its own danger of injustice and the subversion of the ultimate search for truth. It is not an action lightly to be taken.

The United States Court of Appeals for the Seventh Circuit, dealing with a claim that identification of the defendant by a witness was inherently unreliable because the witness had been present at a meeting of prosecution witnesses where the description of the defendant was discussed, said:

The rule that the prosecution cannot bring all its witnesses together prior to trial to discuss their testimony is one to ensure the credibility of the witnesses. That the

witnesses in this case did meet together, and did discuss some aspects of their testimony was a proper subject for impeachment on cross-examination and for comment during closing argument. However, the violation here is not so extreme as to render the witnesses' testimony incredible as a matter of law, nor is it so extreme as to deny the petitioner fundamental fairness in his trial. As was noted in the section immediately prior to this, questions of admissibility of evidence are determined by state law and are not reviewable in a federal habeas corpus proceeding unless there has been an error of such magnitude as to deny fundamental fairness. Although the actions of the prosecutors here were improper, the witnesses' testimony was admissible, and its admission did not deny petitioner a fair trial.

*United States ex rel. Clark v. Fike,* 538 F.2d 750, 758 (7th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977). In the case before us, the prosecutor was sensitive to the possibility that witnesses reviewing Lawrence's deposition might be influenced by Lawrence's identification of Earp as his attacker, and the witness who was to make an in-court identification was not permitted to see that part of the deposition.

The trial judge expressly found that full disclosure to the trier of fact was an effective remedy in this case. We conclude that the trial judge properly refused to exclude the testimony of Jacobs and Pagan.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE-HALF BY RESPONDENT AND ONE-HALF BY MONTGOMERY COUNTY.