6 A.3d 343

**Scott Allen PRYOR**

v.

**STATE of Maryland.**

**No. 0118, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 1, 2010.

316

Celia Anderson Davis (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Stephen M. Ruckman (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., KEHOE and PAUL E. ALPERT (Retired, Specially Assigned), JJ.

PAUL E. ALPERT, J. (Retired, Specially Assigned).

Scott Allen Pryor, appellant, was convicted at a bench trial in the Circuit Court for Howard County of first-degree arson, first-degree assault, two counts of second-degree assault, first-degree burglary, and two counts of reckless endangerment.[1] The court subsequently sentenced appellant to a total of 63 years of imprisonment: 25 years for arson; a consecutive 25 years for first-degree assault; a concurrent ten years for burglary; a consecutive eight years for second-degree assault; and a consecutive five years for reckless endangerment. His remaining convictions were merged for sentencing purposes. Appellant presents three questions for our review:

I. Did the trial court err when it denied appellant's motion to suppress?

II. Did the trial court err in not granting appellant's motion for judgment of acquittal for each of his convictions?

III. Did the trial court err when it refused, for sentencing purposes, to merge appellant's conviction for first-degree assault into his conviction for first-degree arson?

We answer each of the above questions in the negative and shall affirm the judgments.

## SUPPRESSION HEARING FACTS

Prior to trial, appellant moved to suppress two statements he made to the police and tangible evidence the police seized

---

1. The court found appellant not guilty of attempted first-degree murder.

after his first statement. Appellant made the first statement to the police at his house on the evening of the arson. He made the second statement a few days later at a police station following his arrest. At the suppression hearing, three detectives from the Howard County Police Department testified for the State: Corporal Aaron Dombrowsky, the lead investigator; Clay Davis, who assisted Detective Dombrowsky during appellant's first statement; and Edward Upton, who assisted Detective Dombrowsky during appellant's second statement. The facts elicited at the suppression hearing, which appellant did not dispute, showed the following.

Around 7:00 a.m. on November 19, 2007, a fire consumed an end-unit townhouse at 5769 Flagflower Place in Columbia, Maryland. The townhouse belonged to Sheryl Alman, appellant's ex-girlfriend. Ms. Alman's daughter, Breanna, and the daughter's boyfriend, Andrew Lee, were injured in the fire; Breanna was critically injured. It was determined that an accelerant, a flammable liquid used to ignite or accelerate a fire, was used, and appellant was a potential suspect. After the fire was extinguished, Detective Dombrowsky spoke with the firefighters and officers involved in extinguishing the fire and several arson investigators.

Around 8:30 p.m. on the day of the fire, Detectives Dombrowsky and Davis went to appellant's home in Essex to interview him in connection with the arson. Detectives Dombrowsky and Davis, dressed in plain clothes but wearing their service revolvers, knocked on the front door of appellant's home. When appellant opened the door, the detectives identified themselves as police officers and asked if they could come inside and talk to him. Appellant invited the detectives inside and the three sat around a dining room table. Detective Davis recorded the ensuing conversation on a handheld digital audio recorder that was in his pocket. Both detectives consented to the recording of their voices; appellant did not know that the conversation was being recorded.

The detectives testified that during their conversation with appellant they did not threaten him, make any promises, or

yell at him. They testified that they had no physical contact with appellant and never displayed their weapons to him. During the conversation, appellant expressed little emotion and said nothing when informed of the fire or that Breanna, Ms. Alman's twenty-one year old daughter, had been injured in the blaze. After the conversation, appellant consented to a search of his car. Detective Dombrowsky smelled gasoline coming from the trunk of the car but decided not to arrest appellant at that time. The detectives then left appellant's home.

The detectives returned to the police station, conferred with several arson investigators, and obtained a search warrant for appellant and his home. Around 1:00 a.m. the next day, November 20, the detectives returned to appellant's home with an accelerant trained dog. The detectives knocked on the door, but no one answered. The detectives took the dog to appellant's parked car where the dog alerted for the presence of an accelerant. The detectives seized the car.

Around 5:00 a.m. the following day, November 21, appellant was arrested and taken to a police station. Around 6:00 a.m., he was placed in an interview room that measured approximately eight feet by five feet and contained a table and three chairs. The room was wired for video and sound. Appellant was not handcuffed. After appellant waived his *Miranda*[2] rights, Detective Dombrowsky and Detective Upton questioned appellant. The detectives testified that they did not wear their service revolvers, and did not threaten appellant, make any promises, or have any physical contact with him during the interview.

Detective Dombrowsky testified that they spoke with appellant for about 30–40 minutes, during which appellant admitted to setting the fire. Detective Dombrowsky then stepped outside the interview room to check the video equipment. Detective Upton, who remained in the room with appellant, asked appellant if he wanted to write an apology letter.

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant indicated that he did, and he was given a pen and paper.

During the break in the interview, which Detective Dombrowsky estimated lasted about ten minutes and Detective Upton estimated lasted a few minutes, it was learned that the audio portion of the video system had failed to record. Detective Dombrowsky re-entered the interview room with a handheld digital recorder and asked appellant to repeat what he had said. Appellant reiterated that he had set the fire. That interview lasted ten minutes. During the break, appellant never asked for an attorney nor ever stated that he did not want to talk anymore.

The tape and a transcription of the conversation appellant had with the police at his home was entered into evidence at the suppression hearing. The tape and a transcription of appellant's second statement to the police at the police station, as well as his letter of apology, were likewise introduced into evidence at the suppression hearing.

At the conclusion of the testimony, defense counsel argued that appellant's first statement to the police on November 19, 2007, should be suppressed because it was taken in violation of: 1) Maryland's wiretap law, and 2) *Miranda* because appellant was in custody while questioned in his home. Defense counsel also argued that the seizure of appellant's car and the evidence contained in it, and appellant's second statement to the police on November 21, 2007, should be suppressed because they were the fruits of the illegal first statement. Additionally, defense counsel argued that appellant's second statement to the police on November 21, 2007, should be suppressed because it was taken in contravention of *Miranda* because there was a break in custody and appellant was not re-advised of his rights to remain silent and to have counsel present. The trial court denied the motion.

## DISCUSSION

### I.

Appellant argues that the suppression court erred in denying his motion to suppress and raises the same arguments that

he raised below. We find no error by the suppression court. We shall address each argument in turn.

### A. November 19th Statement—Wiretap Statute

■ Appellant argues that his November 19th statement should have been suppressed because it was taken in violation of the Maryland Wiretapping and Electronic Surveillance Act ("Maryland's Wiretap Act"). Md.Code (2006), Courts & Judicial Proceedings (CJ), §§ 10–401 through 414. Specifically, appellant argues that his statement, which was recorded without his consent, was illegal because the State failed to show that when the recording was made there existed a risk to public safety as required by the statute. Appellant is legally wrong.

Maryland's Wiretap Act generally prohibits the interception or recording of oral communications except under certain enumerated circumstances, including exceptions for police officers investigating certain crimes. *See* CJ § 10–402(a). Specifically, the Act makes it

> lawful under this subtitle for an investigative or law enforcement officer acting in a criminal investigation or any other person acting at the prior direction and under the supervision of an investigative or law enforcement officer to intercept a wire, oral, or electronic communication in order to provide evidence: 1. Of the commission of: ... I. A felony under Title 6, Subtitle 1 of the Criminal Law Article[.]

Section 10–402(c)(2)(ii). Arson and burning crimes are contained in the listed title and subtitle. *See* Md.Code Ann., Crim. Law §§ 6–101 through 6–111.

Appellant argues that the State failed to show that "at the time the recording was made[ ] there existed a risk to public safety." Appellant cites no support for such an interpretation. Certainly, the explicit wording of the statute contains no such requirement, nor are we aware of or has appellant cited any case law that suggests such a requirement. The only time the Maryland Wiretap Act requires a showing of public safety is when a police officer utilizes a "body wire" to intercept an oral

communication.[3] *See* § 10–402(c)(6). In those circumstances, the statute requires a reasonable belief that "a law enforcement officer's safety may be in jeopardy." *Id.* Here, a hand held recorder was used, not a body wire. Thus, contrary to appellant's argument, there was no requirement that the State show that there was a public safety risk at the time of the recording.

## B. November 19th Statement—*Miranda*

■ Appellant next argues that his statement on November 19, 2007, should have been suppressed because it was taken in violation of *Miranda*. Although the trial court found that appellant was not in custody when he was interviewed at his home, appellant challenges that conclusion. He argues that when he was questioned by the detectives there was a coercive quality as evidenced by: (1) the detectives interviewed him at his house around 8:30 p.m., (2) the detectives were armed with their service weapons, (3) appellant was questioned by two detectives, and (4) appellant was isolated while he was questioned. We find no error by the trial court.

In the landmark case of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that statements obtained during "custodial interrogation" were not admissible unless the suspect had been previously informed of certain constitutional rights. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of

---

**3.** A "body wire" is described as "a band that goes around the chest or stomach area[ ] and a digital recorder[,]" which is placed underneath the clothing. *Lee v. State,* 186 Md.App. 631, 643 n. 6, 975 A.2d 240 (quotation marks omitted), *cert. granted,* 411 Md. 355, 983 A.2d 431 (2009). *See also Whittlesey v. State,* 340 Md. 30, 42, 665 A.2d 223 (1995) (describing a "body wire" as "a small device containing a microphone and transmitter which can be easily concealed."). A "handheld audio recorder" is a device that is "similar in look and feel to normal mini-cassette tape recorders, except they can record hundreds of hours of digital audio." *See* http://www.communication.howstuffworks.com/how-recording-conference-calls-works2.htm

action in any significant way." *Miranda,* 384 U.S. at 444, 86
S.Ct. 1602 (footnote omitted). In making that determination,
"a court must examine all of the circumstances surrounding
the interrogation, but the ultimate inquiry is simply whether
there was a formal arrest or restraint on freedom of move-
ment of the degree associated with a formal arrest." *Stans-
bury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128
L.Ed.2d 293 (1994) (quotation marks, brackets, and citation
omitted). The interrogation is to be judged by an objective
standard and "not the subjective views harbored by either the
interrogating officers or the person being questioned." *Id.* at
323, 114 S.Ct. 1526.

The Court of Appeals had set forth several factors that may
be relevant in determining whether a person is in custody for
purposes of *Miranda,* including:

> when and where [the interrogation] occurred, how long it
> lasted, how many police were present, what the officers and
> the defendant said and did, the presence of actual physical
> restraint on the defendant or things equivalent to actual
> restraint such as drawn weapons or a guard stationed at the
> door, and whether the defendant was being questioned as a
> suspect or as a witness. Facts pertaining to events before
> the interrogation are also relevant, especially how the defen-
> dant got to the place of questioning—whether he came
> completely on his own, in response to a police request, or
> escorted by police officers. Finally, what happened after
> the interrogation—whether the defendant left freely, was
> detained or arrested—may assist the court in determining
> whether the defendant, as a reasonable person, would have
> felt free to break off the questioning.

*State v. Rucker,* 374 Md. 199, 209, 821 A.2d 439 (2003)
(citations omitted).

Here, the questioning took place around 8:30 p.m. at the
dining room table in appellant's home. The two detectives
had knocked on the door, identified themselves as police
officers, and were invited in. The detectives did not threaten,
promise inducements, or yell at appellant during the question-

ing. Although they were armed, the detectives did not display their weapons. Appellant was not restrained in any way—he was not handcuffed at any time and the detectives did not come into physical contact with him at any time before or during the questioning. After the questioning was over, the detectives left appellant's home—he was not arrested. Under the circumstances, we are persuaded that appellant was not in custody while questioned. *Cf. Rucker, supra* (no custody where accused was stopped by police officer at 5:20 p.m. in a public parking lot of a shopping center where detention was less than an hour from picking up informant to accused giving statement, three officers were on scene but two had backed away and only one asked questions, license and registration were taken but return was not conditioned on the accused's cooperation, there was no drawing of weapons, and the accused was not handcuffed or actually restrained).

The facts here are easily distinguishable from the two cases cited by appellant where custody was found. In *Orozco v. Texas,* 394 U.S. 324, 325, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), four police officers entered the suspect's bedroom in a boarding house at 4:00 a.m. and woke him from his sleep to question him. In *Bond v. State,* 142 Md.App. 219, 223–24, 788 A.2d 705 (2002), three police officers entered the suspect's bedroom of his trailer sometime after 10:30 p.m. and questioned him while he was sitting in bed with his shirt off. In contrast, we find the facts here similar to those in *Beckwith v. United States,* 425 U.S. 341, 343–44, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In that case, the United States Supreme Court found no custody where two IRS agents came to the defendant's home at 8:00 a.m., were invited in, interviewed the defendant around his dining room table, and the defendant was not arrested when the police left.

## C. Fruit of the Poisonous Tree

Appellant next argues that because his November 19th statement was taken in violation of *Miranda,* all the subsequent evidence gathered by the police—the evidence obtained from the search of his car and his statement two days later—

should have been suppressed under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States,* 371 U.S. 471, 485–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We can quickly dispose of appellant's argument for two reasons. First, as discussed above, the trial court properly denied appellant's motion to suppress his statement on November 19th because there was no custody so as to trigger *Miranda.* Thus, there was no poisonous tree. Second, even if there had been a *Miranda* violation, the fruit of the poisonous tree doctrine would not apply because *Miranda* violations are not constitutional violations. *See Smith v. State,* 186 Md.App. 498, 515, 974 A.2d 991 (2009) ("[B]oth this Court and the Court of Appeals have recognized this pivotal difference between a constitutional violation itself which will trigger the 'fruit of the poisonous tree' doctrine and a 'mere *Miranda*' violation which will not trigger that doctrine.") (quotation marks and citation omitted), *aff'd,* 414 Md. 357, 995 A.2d 685 (2010).

### D. November 21st Statement—*Miranda*

Lastly, appellant argues that his November 21st statement should have been suppressed because there was a break during the interrogation and he was not re-advised of his *Miranda* rights when the interrogation resumed. We are inclined not to address his argument because appellant fails to cite any case law in an area saturated with case law—he fails to cite the standard by which we review this issue, the factors to be applied, or the facts of any case he finds persuasive. *See* Md. Rule 8–504(a)(5), (c) and *Klauenberg v. State,* 355 Md. 528, 552, 735 A.2d 1061 (1999) (if a point germane to the appeal is not adequately raised in a party's brief or presented with particularity an appellate court may, and ordinarily should, decline to address it.). We shall, however, address his argument but find it devoid of merit.

 ██ "In determining whether a defendant should have been re-advised [of his *Miranda* rights during a break between interviews,] courts look to the totality of the circumstances." *Harper v. State,* 162 Md.App. 55, 86, 873 A.2d 395 (2005) (citing *State v. Tolbert,* 381 Md. 539, 551, 850 A.2d 1192, *cert.*

*denied,* 543 U.S. 852, 125 S.Ct. 263, 160 L.Ed.2d 85 (2004)). A non-exhaustive list of factors include:

> (1) the length of time between the giving of the first warnings and the subsequent interrogation . . .; (2) whether the warnings and the subsequent interrogation were given in the same or different places . . .; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers . . .; (4) the extent to which the subsequent statement differed from any previous statements . . .; (5) the apparent intellectual and emotional state of the suspect.

*Harper,* 162 Md.App. at 86–87, 873 A.2d 395 (quotations marks and citation omitted).

■ Here, during his interview at the police station, appellant waived his *Miranda* rights and gave a statement. That interview lasted forty minutes. A ten minute break was taken, after which appellant made a second statement, which lasted ten minutes. The entire interview process at the police station lasted around an hour. The brevity of the overall encounter and the brief length of time of the break support the conclusion that the police were not required to re-advise appellant of his *Miranda* rights after the break. *See Tolbert,* 381 Md. at 554, 850 A.2d 1192 (re-advisement of *Miranda* rights not required where two and a half hours passed between advisement of *Miranda* rights and defendant's incriminating statement); *Harper,* 162 Md.App. at 87, 873 A.2d 395 (re-advisement of *Miranda* rights not required where two hours passed between advisement of *Miranda* rights and defendant's interrogation). Additionally, the two statements took place in the same room, the same detectives were present during both statements, the statements apparently did not differ in their general complicity, and there was no apparent change in appellant's intellectual and emotional state between the two statements. Accordingly, we find no error by the trial court in concluding that there was no *Miranda* violation because the police did not re-advise appellant of his *Miranda* rights between the two interviews.

## II.

Appellant argues that the evidence was not sufficient to support his convictions. He argues that because his two statements and the physical evidence seized in connection with the investigation should have been suppressed, the remainder of the State's case was based on circumstantial evidence which was legally insufficient to support his convictions. As recounted above, however, his motion to suppress was properly denied so both statements were properly admitted at trial along with all the evidence seized in connection with the investigation. Addressing each conviction, we find no merit to his arguments.

When reviewing the sufficiency of the evidence, our task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Taylor v. State,* 346 Md. 452, 457, 697 A.2d 462 (1997) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "[W]hen evaluating the sufficiency of the evidence in a non-jury trial, the judgment of the trial court will not be set aside on the evidence unless clearly erroneous[.]" *State v. Raines,* 326 Md. 582, 589, 606 A.2d 265, *cert. denied,* 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992). *See also Khalifa v. State,* 382 Md. 400, 418, 855 A.2d 1175 (2004); Md. Rule 8–131(c). This is because we accord deference to the factual findings of the trial judge and give due deference to his ability to observe the demeanor of the witnesses and to assess their credibility. *Wiggins v. State,* 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Bryant v. State,* 142 Md.App. 604, 622, 791 A.2d 161, *cert. denied,* 369 Md. 179, 798 A.2d 552 (2002).

As with direct evidence, circumstantial evidence will sustain a conviction when all the facts taken together do not require that the fact-finder to resort to speculation or mere conjecture. *Taylor,* 346 Md. at 458, 697 A.2d 462. "Where it is reasonable for a trier of fact to make an inference, we must

let them do so, as the question is not whether the [trier of fact] could have made other inferences from the evidence or even refused to draw any inference, but whether the inference [it] did make was supported by the evidence." *State v. Suddith,* 379 Md. 425, 447, 842 A.2d 716 (2004) (quotation marks and citation omitted) (brackets in *Suddith* ).

A fact-finder is free to believe part of a witness's testimony, disbelieve other parts of a witness's testimony, or to completely discount a witness's testimony. *Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985). Contradictions in testimony go to the weight of the testimony and credibility of the evidence, rather than its sufficiency, and we do not weigh the evidence or judge the credibility of the witnesses, as that is the responsibility of the trier of fact. *See Longshore v. State,* 399 Md. 486, 499–500, 924 A.2d 1129 (2007); *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998) (citing *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991)).

At appellant's trial, several witnesses testified for the State, including several police officers and firefighters, Ms. Alman, her daughter Breanna, and Breanna's boyfriend, Andrew Lee. Appellant did not take the stand and called no witnesses on his behalf. Viewing the evidence in the light most favorable to the State, the following was established.

Appellant and Ms. Alman began dating in 2004, and he moved into her townhouse in September 2006. Ms. Alman's daughter lived in the townhouse at all times while appellant lived there. In October 2007, Ms. Alman asked appellant to leave and he did. Appellant wanted to work things out; Ms. Alman did not.

Appellant admitted in his recorded statement to the police on November 21, 2007, that he set fire to Ms. Alman's house. He stated that he decided to set fire to the house either the night before or the morning of the fire. He told the police that on the morning of the fire he went to a gas station and bought a gallon of gasoline. He then drove to Ms. Alman's house and entered the house through the kitchen door, unlocking the door with his keys. He poured the gasoline "on

multiple areas" on the first floor, lit the gasoline on fire, and then left the house. When appellant set fire to the house, Breanna and Andrew Lee were asleep in Breanna's upstairs bedroom, and shortly after setting the fire, neighbors saw smoke billowing out of every front window of the townhouse. The police were called.

While waiting for the police, neighbors pulled Lee out of a second-story window. His body was completely covered in and he was spitting smoke residue. He was taken to a hospital, treated, and released. Firefighters rescued Breanna just inside the front door. She was not breathing, nor did she have a pulse. She was transported to the Bayview Burn Center, where she was largely unconscious for six weeks. She was in the hospital a total of four months. She suffered third degree burns over 40% of her body and from smoke inhalation. She underwent 14 operations while hospitalized.

Appellant's confession to the police was corroborated by several pieces of physical and testimonial evidence, including: a receipt showing appellant purchased gasoline from a gas station less than two miles from appellant's home an hour before the fire; a neighbor's testimony that she saw appellant leave the area "walking fast" five minutes before the fire was detected; a letter appellant sent from jail to his ex-wife several months after the fire in which he admitted that he put himself in a "situation ... with the law" because "I let my anger take over and cloud my judgment and I lashed out and did what I did[.]"; testimony from a police office accepted as an expert in fire and arson that all accidental causes of the fire were eliminated during his investigation; and a stipulation by the parties that gasoline was detected on five, first-floor carpet samples taken by the police and on a gym bag recovered from the trunk of appellant's car on November 20, 2007.

We shall add additional facts where necessary.

### A. Arson in the first-degree

Appellant argues that while there was sufficient evidence to show that he intentionally set fire to Ms. Alman's

house, there was insufficient evidence to show that he acted with malice to sustain his first-degree arson conviction. Appellant argues that to prove malice the State was required to show that he intended to harm a person. Appellant cites *DeBettencourt v. State,* 48 Md.App. 522, 532, 428 A.2d 479 (1981), in support of his argument. Appellant is wrong.

Section 6–102 of the Md.Code (2002), Crim. Law Art., which defines first-degree arson, provides that a person "may not willfully and maliciously set fire to or burn: (1) a dwelling; or (2) a structure in or on which an individual who is not a participant is present." The statute defines "maliciously" as meaning "acting with intent to harm a person or property." *See* § 6–101(c) (emphasis added). Thus, contrary to appellant's argument, under the arson statute, one who sets fire to a dwelling need not intend to harm a person.

Appellant directs our attention to a statement in *DeBettencourt,* 48 Md.App. at 532, 428 A.2d 479, an arson case, where we said that "malice" means the "intentional setting of a dangerous fire with reckless and wanton disregard of the consequences in terms of the danger of bringing harm to others[.]" We note that we also stated in *DeBettencourt* that malice is to intentionally "set a fire with reckless indifference to the danger toward the persons or property of others." *Id.* at 530–31, 428 A.2d 479 (emphasis added).

No one disputes that Ms. Alman's townhouse was a structure. A clear reading of the arson statute requires the person to act maliciously, which is defined to include the intent to harm property. A fair reading of our opinion in *DeBettencourt* does not change the plain meaning of the statute. *DeBettencourt* clearly stated that malice means acting with reckless disregard toward a person *or* the property of others. Clearly, appellant's act of setting fire to Ms. Alman's townhouse, an end unit in obvious close proximity to her neighbor, showed malice. Accordingly, we find sufficient evidence to support appellant's first-degree arson conviction.

## B. Burglary in the first-degree

Appellant next argues that the State failed to show that he committed a "breaking" into Ms. Alman's house. Appellant admits that he entered Ms. Alman's house but argues that the evidence showed he had permission to do so. He directs our attention to the fact that he had a set of keys to the house and had visited Ms. Alman the weekend before the fire.

Section 6–202(a) Crim. Law Art. provides that a person "may not break and enter the dwelling of another with the intent to commit theft or a crime of violence." The "breaking" element retains its common law meaning. Section 6–201(b). Breaking can be by means of opening a closed but unlocked door. *Holland v. State,* 154 Md.App. 351, 367, 839 A.2d 806 (2003) (citation omitted). A breaking does not occur, however, when the one who enters has "authority to do so at that particular time." *Reagan v. State,* 2 Md.App. 262, 268, 234 A.2d 278 (1967) (citation omitted).

Appellant had moved out of Ms. Alman's house about a month before the fire, taking his belongings with him. Appellant had returned to her house the Saturday before the fire to retrieve some of his things, but he called before hand to make sure she was at home. Ms. Alman testified that he did not have permission to enter her house the morning of the fire. That appellant still had keys to the house and had visited Ms. Alman (with her permission) the weekend before the fire does not diminish the fact that he did not have permission to enter her house the morning of the fire. Accordingly, there was sufficient evidence to sustain this conviction.

## C. Reckless Endangerment of Andrew Lee and Marjorie Kemp

Appellant argues that his reckless endangerment convictions must be reversed. He argues that because there was no evidence that he "actually" knew that Lee was inside the house or that the next door neighbor, Kemp, was present when he set fire to the house, there was insufficient evidence

to show that he intended to harm them. As related below, reckless endangerment does not require that appellant knew that Andrew Lee was present when he set fire to Ms. Alman's house, but that appellant's conduct in setting the fire manifested a conscious disregard to the risks it created, specifically a substantial risk of death or serious bodily injury.

Section 3–204(a), Crim. Law, provides that a person "may not recklessly: (1) engage in conduct that creates a substantial risk of death or serious physical injury to another[.]" We have stated that the mens rea of reckless endangerment,

> far from intending, striving, desiring or purposing to bring about a harmful consequence, or any consequence for that matter, is blithely unconcerned with the possible consequences. The state of mind of recklessness, in the context of reckless endangerment as well as in other criminal contexts such as depraved heart murder and possibly grossly negligent manslaughter, is variously described as an attitude wherein the criminal agent, conscious of the life-endangering risk involved, nonetheless acts with a conscious disregard of or wanton indifference to the consequences.

*Williams v. State,* 100 Md.App. 468, 474, 641 A.2d 990 (1994). In deciding whether certain behavior is reckless, a fact finder must evaluate the defendant's conduct objectively, from the standpoint of an ordinary law-abiding citizen under similar circumstances. *Jones v. State,* 357 Md. 408, 427, 745 A.2d 396 (2000).

### i. Andrew Lee

Evidence presented at trial showed that Lee had been dating Breanna since November 2005, and in the fall of 2007, while appellant was living regularly at the house, Lee was spending an average of five nights a week in Breanna's room. Lee and Breanna were taking college courses the fall of 2007, and they left the house around 9:30 a.m. to get to their 10:00 a.m. classes. Ms. Alman left for work around 7:15 a.m. every weekday. During the time appellant and Lee stayed at Ms.

Alman's house, Lee drove a Nissan and Breanna drove a Toyota Camry. When interviewed at the police station, appellant told Detective Dombrowsky where Breanna and Lee regularly parked their cars, stating, "[she] normally [parks] right in the road next to the house. If not, if she can't get a spot when she comes back in from work or out with her boyfriend she's on just the opposite side of the median. That center island." Ms. Alman testified that Breanna and Lee "always" used the front door, and it was her "house policy" that they take off their shoes and leave them in the front foyer. On the morning of the fire, Breanna's and Lee's cars were parked in their usual places and their shoes were in the front foyer.

Contrary to appellant's argument, the State need not produce evidence that appellant "actually" knew that Lee was inside the home when the fire was set. Rather, the State was required to prove that appellant was aware that his conduct created a risk of death or serious physical injury to Lee and that he consciously disregarded that risk. Evidence shows that Lee's car was parked in its usual easily visible spot in the parking lot near Ms. Alman's home. Also, Lee's shoes were beside the front door, as was routine when he was spending the night. Certainly, the fact-finder could infer that appellant was aware that Lee might be present so as to sustain his conviction for reckless endangerment.

### ii. Marjorie Kemp

 Marjorie Kemp was Ms. Alman's next door neighbor; they shared an adjoining wall. On the morning of the fire, she was getting ready for work when the smoke detectors went off in her house. When she opened the front door to her house smoke was billowing out of Ms. Alman's house. When the fire department arrived several minutes later, they told her not to go back in her house until the fire was completely under control, a process that took several hours. Her house sustained substantial smoke damage to the walls, ceiling and carpeting. She testified that she knew appellant and saw him at Ms. Alman's house on many occasions. Additionally, she

testified that she usually left for work between 8:30 and 9:00 a.m.

We agree with the State that when appellant intentionally lit a gasoline-fed fire in the first floor of Alman's house, which was attached to Kemp's house and knowing that Kemp was getting ready to leave for work, appellant engaged in reckless conduct that created a substantial risk of serious physical injury to Ms. Kemp.

### D. Second-degree assault of Andrew Lee and Breanna Alman and first-degree assault of Breanna Alman

 Appellant argues that these convictions must be reversed because the State failed to establish that he knew that Andrew Lee or Breanna Alman were inside the house when he set fire to it. Appellant's argument is without merit.

 Maryland retains the common law meaning of assault. *See* Crim. Law § 3–201(b) (" 'Assault' means the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings."). There are three forms of assault: the intent to frighten, an attempted battery, and a battery. *Christian v. State,* 405 Md. 306, 316–322, 951 A.2d 832 (2008) (analyzing the common law and statutory history of assault and battery in Maryland). Here, the trial court found appellant guilty of the battery form of second-degree assault. That form of second-degree assault requires: (1) that the defendant caused offensive physical contact with the victim; (2) that the contact was the result of an intentional *or* reckless act of the defendant and was not accidental; and (3) that the contact was not consented to or legally justified. *See* Md. Pattern Jury Instructions—Cr. 4:01C. "It is [ ] clear that the presence of a specific intent or criminal negligence is a necessary component of the crime of battery and it is the State's burden to prove one or the other of these elements[.]" *Elias v. State,* 339 Md. 169, 184–85, 661 A.2d 702 (1995)

 First-degree assault requires all the elements of second-degree assault, plus that the accused causes or attempts

to cause "serious physical injury to another." Crim. Law § 3–202(a)(1). Serious physical injury is defined as that which creates: 1) a substantial risk of death; or 2) causes permanent or protracted serious; i) disfigurement; ii) the loss of the function of any bodily member or organ; or iii) the impairment of the function of any bodily member or organ. Crim. Law § 3–201(d). "[S]ince intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence." *State v. Earp*, 319 Md. 156, 167, 571 A.2d 1227 (1990) (quotations and citation omitted).

### i. Andrew Lee and Breanna Alman— Second-degree assault

As with reckless endangerment, appellant argues that his second-degree assault convictions should be reversed because the State did not establish that he knew that Lee or Breanna were home when he set the fire. Accordingly, the State failed to show that he intended to harm them. As the State correctly argues, this argument is misplaced, because as stated above, second-degree assault (battery form) may be committed by a reckless act. Under the circumstances, we are persuaded that the State proved that appellant acted recklessly in setting fire to Ms. Alman's house so as to sustain appellant's second-degree assault convictions as to Lee and Breanna.

### ii. Breanna Alman—First-degree assault

Appellant likewise argues that his first-degree assault conviction must be reversed because the State failed to prove that he intended to cause serious physical injury to Breanna, because he did not know that she was home when he set fire to the house. We disagree.

The trial court specifically addressed the intent required to find appellant guilty of first-degree assault against Breanna, *i.e.*, that appellant intended to cause serious physical injury. The trial court made the following findings of facts:

The Defendant, certainly having resided there, was well aware of her schedule, and there's no dispute as to her schedule when she was taking classes. She didn't take classes that began before 10:00 in the morning. She would typically leave around, I think she said 9:00 or 9:30, but in any event well after the time that this particular fire was started.

In addition to that, she testified—there was testimony that she also worked at the mall, and the testimony is clear that those working hours were after school. So, again, no evidence that she was ever out of the house early hours of the morning, and that was in fact her pattern and practice for those several years.

There was also testimony as to where she parked her car in the parking lot, that she generally parked in the same area. The testimony was unrefuted that the Defendant knew the make and model of her car, the color of her car, had in fact worked on her car, driven her car, so clearly was aware of which car was hers.

The testimony was also unrefuted that at the hour of the morning when this fire took place, that the parking lot was fairly empty. So clearly it would not have been difficult, and I can draw an inference it would not have been difficult, especially being familiar with her car, to have noticed that car in the parking lot.

In addition, there was testimony about the practice and, in fact, the—I think it was described as sort of like a house rule that the shoes would be taken off upon entering the house through the front door. This was Breanna's practice all the time. There was testimony that the shoes were in the foyer and that there wasn't anything physically obstructing a view from the dining room into the foyer, so the shoes would also have been readily visible.

* * *

So I find that the State proved with all of the testimony and evidence that the Defendant intended to cause serious physical injury in the commission of the assault. He knew

her schedule. He set the fire with certainly with full knowledge—I can infer pretty comfortably that he had knowledge that there were people upstairs. There was no testimony that either Breanna or Andy were downstairs on the first floor. They were sleeping upstairs when this occurred. So I do find that the specific intent element as to the assault itself has been proven by the State. I make that finding beyond a reasonable doubt.

We do not find the trial court's findings clearly erroneous. Accordingly, we shall affirm the trial court's conviction.

## III.

 The trial court imposed, among other things, a sentence of 25 years of imprisonment for first-degree arson and a consecutive 25 years of imprisonment for first-degree assault of Breanna. Appellant argues that the trial court erred in not merging those convictions for sentencing purposes. He recognizes that the convictions would not merge under the required evidence test because each contains an element that the other does not. He argues that the convictions should merge under the rule of lenity or fundamental fairness, however, because the convictions were based on the same act and there was no indication that the legislature intended separate punishments. The State disagrees, as do we.

 The "rule of lenity," a rule of statutory construction, "provides that doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction will be resolved against turning a single transaction into multiple offenses." *Holbrook v. State,* 364 Md. 354, 373, 772 A.2d 1240 (2001) (quotation marks and citations omitted). *See also Pineta v. State,* 98 Md.App. 614, 620–21, 634 A.2d 982 (1993). We have stated that the rule is purely a question of reading legislative intent. If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated choice.... If the Legislature intended but a single punishment, we defer to that legislated choice. If we are uncer-

tain as to what the Legislature intended, we turn to the so-called 'Rule of Lenity,' by which we give the defendant the benefit of the doubt.

*Walker v. State,* 53 Md.App. 171, 201, 452 A.2d 1234 (1982), *cert. denied,* 296 Md. 63 (1983) (quotation marks and citations omitted).

■■■ Where the rule of lenity does not mandate a single punishment for two offenses, fairness to the defendant remains a consideration. *Monoker v. State,* 321 Md. 214, 223, 582 A.2d 525 (1990). Where a particular crime is an integral component of another such that the former ripens into the latter, it may be considered fundamentally unfair to require multiple sentences. *Id.*

As related above, first-degree arson requires that a defendant willfully and maliciously set fire to a building. Crim. Law § 6–102(a)(1). First-degree assault requires evidence that a defendant may not cause or attempt to cause serious physical injury to another where the act was intentional or reckless and the harm was not consented to by the victim nor legally justified. Crim. Law § 3–202(a)(1).

Here, we are not persuaded that the punishments in this case should merge under either the rule of lenity or fundamental fairness. The legislature plainly set out separate punishments for first-degree arson and first-degree assault and so there is no ambiguity as to what the legislature intended. *Cf. Wooten–Bey v. State,* 76 Md.App. 603, 629, 547 A.2d 1086 (1988) (finding improper the application of the rule of lenity where case involved two separate criminal acts for which the Maryland Legislature has provided distinct punishments), *aff'd,* 318 Md. 301, 568 A.2d 16 (1990). Moreover, we are not persuaded that we should apply the doctrine of fundamental fairness. While it is true that here the crime of first-degree assault was perpetrated by means of arson, each crime punishes a different harm. First-degree arson is a crime against property and first-degree assault is a crime against a person. *Cf. Holbrook v. State,* 364 Md. 354, 372, 374, 772 A.2d 1240 (2001) (rejecting the claim of merger of reckless endangerment and arson under the rule of lenity where the legislature

codified the former offense as one against the person and the latter offense as one against property). Accordingly, we shall affirm the sentences imposed.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**