30 A.3d 1032

**Antwan GRYMES a/k/a/ Antoine Grimes**

v.

**STATE of Maryland.**

**No. 1838, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Oct. 28, 2011.

72

74

George W. Hicks, Jr., Washington, DC (Williams & Connolly, LLP, Washington, DC, on the brief, and Paul B. DeWolfe, Public Defender, Baltimore, MD, on the brief), for Appellant.

Robert Taylor, Jr. (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI, ALAN M. WILNER, (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Montgomery County, Antwan Grymes, the appellant, was charged with robbery with a dangerous weapon, assault in the first degree and use of a handgun in the commission of a crime of violence. A jury acquitted him of all charges except the lesser included offenses of robbery and assault in the second degree. He was sentenced to a term of 15 years' incarceration for robbery and a concurrent term of 10 years for assault.

In this Court, the appellant poses four questions for review, which we have reordered and slightly rephrased:

I. Did the motion court err in denying his motion to suppress evidence of a gun found during a warrantless search of the common laundry room of the multi-unit apartment building in which he was living?

II. Did the motion court err in denying his motion to suppress evidence of a cell phone that was the fruit of a custodial interrogation carried out prior to his being advised of his *Miranda* rights? [1]

III. Did the trial court err in permitting the jury to consider evidence of the gun?

IV. Did the trial court err in declining to give a requested jury instruction on missing evidence?

For the following reasons, we shall affirm the judgments.

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**76**

## FACTS AND PROCEEDINGS

In the early evening of November 30, 2009, a group of friends gathered to watch a football game on television at Carroll Walker's apartment, at 8118 Roanoke Avenue, in Takoma Park. In addition to Walker, his girlfriend, Michelle Foster; Walker's cousin, Mabel Williams; Williams's boyfriend, Robert Pumphrey; and two other people were present.

During the gathering, Delores Amankwah, a friend of Williams, came by to see Williams and Pumphrey. Williams, Pumphrey, and Amankwah had been planning to move into an apartment together beginning January 1, 2010. The apartment also was in the 8118 Roanoke Avenue building and the three already had completed a rental application. That evening Pumphrey told Amankwah she could not move in with him and Williams unless she contributed one-third of the security deposit. Amankwah, who was unemployed, could not afford to do so and became very upset.

At the time, Amankwah was living temporarily in a nearby apartment, at 657 Houston Avenue, leased by one Sharon Harkum. Harkum lived on the third floor of that multi-unit apartment building. The appellant, a long-time friend of Harkum, also was staying at her apartment.

After the exchange with Pumphrey, Amankwah left Walker's apartment in tears and walked to Harkum's apartment, where the appellant was present. Amankwah told Harkum and the appellant about her dispute with Pumphrey. Shortly thereafter, the appellant left, saying he was going to "go out and talk to [Pumphrey]."

The appellant went to Walker's apartment and knocked on the door. Walker let him in. The appellant shook hands with everyone and asked each person's name. When Pumphrey identified himself, the appellant asked if they could speak outside. The two men spoke briefly at the door to the apartment before Walker suggested they go into the bedroom to talk. The appellant and Pumphrey entered the bedroom, which was at the back of the apartment.

According to Pumphrey, once the two men were inside the bedroom, the appellant pulled out a handgun, aimed it at him, and demanded that he hand over his coat and wallet. He did so. Pumphrey's cell phone was inside his coat. His wallet contained $150 and a debit card.

Walker overheard the appellant and Pumphrey arguing and asked them to leave the bedroom, which they did. The appellant, still carrying Pumphrey's coat and wallet, exited the apartment. Shortly thereafter, Pumphrey also left, accompanied by Williams. About five minutes later, a man showed up at the apartment and gave Pumphrey's coat to Walker and Foster. The man, who is not identified in the record, but who it appears also was staying with Harkum, said, "Man, I don't know why he did that." Pumphrey's wallet was in the coat pocket, but his cash, debit card, and cell phone all were missing.

In the meantime, Pumphrey and Williams walked to a nearby pizza shop where Pumphrey called 911 and reported that he had just been robbed at gunpoint.[2] A little after 8:00 p.m., Corporal Jerome Irwin of the Takoma Park Police Department ("TPPD") responded to the scene. After learning that the robbery occurred inside the 8118 Roanoke Avenue apartment building, Corporal Irwin drove Pumphrey and Williams back to that location. Corporal Thomas Black and Detective Charles Hoezel arrived shortly thereafter.

The police interviewed Pumphrey, Williams, and Walker, who came outside and returned Pumphrey's coat and wallet to him. All three identified Pumphrey's assailant as "D" or "Dogg" and said they thought he was staying at 657 Houston Avenue. Pumphrey further described the weapon used as "black with a brown handle," and having a long barrel. He thought it possibly was a .38 caliber.

---

**2.** At trial, Pumphrey testified that he used Williams's cell phone to make the call. Williams testified that Pumphrey called from a payphone inside a store near the pizza shop because she did not have any minutes on her phone.

While speaking with police, Pumphrey noticed Amankwah on the street. He told the police that she knew his assailant and might have been involved in the robbery. The police stopped Amankwah, who gave them a false name because there was an outstanding warrant for her arrest. She provided the police with the appellant's first name and confirmed that he currently was staying in the 657 Houston Avenue apartment building.

Around 9:00 p.m., Detective Hoezel and Corporals Erwin and Black went to the 657 Houston Avenue apartment building to look for the appellant. The front door of the building was unlocked. The police entered and went to Harkum's apartment on the third floor. They knocked, and Harkum opened the door. She consented to a search of her apartment.[3] The appellant was not there.

Pumphrey, Williams, and Walker were transported to the TPPD station, where each gave a statement. Detective Hoezel conducted an internal database computer search for people going by the street name "D" or "Dogg" and identified the appellant as a suspect. The police showed Williams and Walker a photograph of the appellant and each positively identified him. Pumphrey was shown a photographic array that contained the appellant's photograph. He quickly selected the photograph as depicting the man who had robbed him.

Six hours later, around 3:00 a.m. on December 1, Detective Hoezel and Corporals Black and Erwin returned to the 657 Houston Avenue apartment building with a warrant for the appellant's arrest. They entered the unlocked front door, went to Harkum's apartment, and found the appellant asleep on the floor in the bedroom. They placed him under arrest. As we shall explain in greater detail, certain items of clothing belonging to the appellant were searched and revealed Pumphrey's cell phone and $112 in cash. Amankwah also was present in Harkum's apartment. She gave her true name to

---

3. Harkum signed a consent form.

the police this time and was arrested on the outstanding warrant.

The appellant and Amankwah were transported to the police station. The appellant declined to give a statement. Amankwah told the police that, after the appellant left Harkum's apartment to "talk to [Pumphrey]," he returned and told her (Amankwah) that he had robbed Pumphrey. She also told the police that, earlier in the evening, she had seen the appellant with a gun. She suggested that the gun might be in the laundry room of the 657 Houston Avenue apartment building.

At 5:30 a.m., Detective Hoezel and Corporal Black returned to the Houston Avenue apartment building for a third time. They did not have a warrant. They entered the laundry room, which was on the first floor and was unlocked, and in a search that we shall discuss in greater detail, *infra*, recovered a loaded .38 caliber revolver from behind a row of washing machines.

As noted, the appellant was charged with robbery with a dangerous weapon, assault in the first degree, and use of a handgun in the commission of a crime of violence. Before trial, he moved to suppress from evidence the gun and the cell phone.[4] A two-day suppression hearing was held and his motions were denied.

The case was tried to a jury for three days. The State called Pumphrey, Williams, Foster, and Amankwah. Each testified, with slight variations, to the facts as we have recounted them. Detective Hoezel, Corporals Black and Erwin, and a firearms expert also testified for the State. The appellant did not testify. He called Harkum as his only witness.

We shall include additional facts in our discussion of the issues.

---

4. The appellant also moved to suppress Pumphrey's pretrial identification of him, arguing that the photographic array was unduly suggestive. He did not prevail and has not raised that issue on appeal.

## DISCUSSION

### I.

### *Search of the Laundry Room*

The appellant contends the circuit court erred by denying his motion to suppress evidence about the gun the police found in the common laundry room of the 657 Houston Avenue apartment building, including the gun itself. He asserts that the warrantless search of the laundry room violated his Fourth Amendment rights. The State responds that the appellant did not have a legitimate expectation of privacy in the common laundry room of the multi-unit apartment building, and therefore his Fourth Amendment rights could not have been violated.

In reviewing the circuit court's ruling on the motion to suppress, "[w]e extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous." *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002) (quoting *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001)). We consider the evidence introduced at the suppression hearing and the reasonable inferences therefrom that are most favorable to the party prevailing on the motion. *State v. Ofori*, 170 Md.App. 211, 218, 906 A.2d 1089 (2006). Nevertheless, we review the ultimate question of constitutionality *de novo* and must "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72 (2010) (quotations omitted).

The evidence adduced at the suppression hearing about the police visits to the 657 Houston Avenue apartment building and their ultimate arrest of the appellant and seizure of the handgun found in the common laundry room is as we have recounted above, with the following additions.

According to Harkum, at the relevant time, the appellant had been living in her apartment for about two months. He kept clothing and food there. Although he did not pay rent,

he helped purchase groceries and assisted with cooking and cleaning.

The front door to the 657 Houston Avenue apartment building and the door to the laundry room on the first floor of that building were kept unlocked at all times. Tenants were issued keys only to their own apartments. The front door of the building was posted with a sign that read, "NO TRES-PASSING. NO LOITERING OR SITTING IN THE HALL-WAY STAIRS, BY ADULTS, CHILDREN OR, GUESTS. VIOLATORS WILL BE ASKED TO MOVE WITHOUT NO-TICE." The laundry room door bore a sign stating that it was "OPEN 8 A.M. TO 8 P.M."

Harkum consented to a search of her apartment when the police made their first visit. According to Detective Hoezel, on the second visit, when the police had an arrest warrant for the appellant, Harkum also consented to a search of the apartment. Harkum disagreed. In any event, as noted above, on that second visit the appellant and Amankwah were arrest-ed and transported to the police station.

When Detective Hoezel interviewed Amankwah at the police station, at a little after 4:00 a.m., she told him that, earlier in the day, she had seen the appellant with a gun. The gun was just "sitting on the floor [in Harkum's apartment], black long nozzle with [a] brown handle." She also told Detective Hoezel that the gun had "gotta be outside somewhere" and later suggested that it "might be in the laundry room" of the apartment building. It was this information that prompted Detective Hoezel and Corporals Black and Erwin to return to that building for a third time, around 5:00 a.m. Just as they had the two previous times, they entered the building through the unlocked front door. This time they headed straight to the laundry room on the first floor, which was unlocked, and searched it. When Corporal Black found a gun stashed behind a row of washing machines, he exclaimed, "there's the gun."

Before the motion court, defense counsel argued that, as a long-term guest of Harkum, the appellant had a legitimate

expectation of privacy not only in Harkum's apartment but also in the laundry room of the 657 Houston Avenue apartment building. The State responded that it was objectively unreasonable for the appellant to have any expectation of privacy in a common laundry room in a multi-unit apartment building in which he was staying as a guest of a tenant.

The motion court found as a fact that Harkum had consented to the initial searches of her apartment and that Amankwah had told the police that she had seen the appellant with a gun and that the gun might be in the laundry room of the 657 Houston Avenue apartment building. With respect to the laundry room, the court opined:

> Now, as indicated in the exhibits, Exhibit No. 2 and I believe Exhibit No. 14, Exhibit No. 14 is a sign on the laundry room door that says "Laundry room open 8 a.m. to 8 p.m." But the laundry wasn't locked. . There is no evidence that the laundry room was locked. It was just a sign saying the times that the laundry room was open.
>
> Presumably in an apartment complex, for the convenience of the tenants, people don't want to hear the noise of laundry machines late at night, and so the hours are 8 a.m. to 8 p.m.

With respect to whether the appellant had a reasonable expectation of privacy in the contents of the laundry room, the court ruled:

> I don't find that the defendant in this case had any reasonable expectation of privacy under these circumstances, particularly he—the only evidence before this Court is that the defendant had been staying at this place for some period of time. The evidence is that there was no other address that he had. There's no evidence that he was a lessee in the place. He had some food there that he kept in the refrigerator and he had some clothing.

> \* \* \*

Notwithstanding that, one of the comments that *Garrison* [5] discusses is whether a person's actions and intentions

---

5. *Garrison v. State,* 28 Md.App. 257, 345 A.2d 86 (1975).

indicate a reasonable expectation of privacy. I think that stashing of a weapon o[r] contraband is not consistent with any reasonable expectation of privacy, but rather consistent with the belief that if it's hidden in those places, it will not be found. I think hiding something in a place where you don't expect it to be found is distinguishable from a reasonable expectation of privacy. I don't know that that particular issue has ever been addressed in that fashion.

For these and other reasons,[6] the court denied the appellant's motion to suppress evidence about the gun.

▇▇▇▇ The Fourth Amendment to the United States Constitution guarantees individuals the right to be secure in " 'their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *Whiting v. State*, 389 Md. 334, 346, 885 A.2d 785 (2005) (quoting *United States v. Stevenson*, 396 F.3d 538, 545 (4th Cir.2005)).[7] "[A defendant] invoking Fourth Amendment protections bears the burden of demonstrating his or her legitimate expectation of privacy in the place searched or items seized." *Williamson v. State*, 413 Md. 521, 534, 993 A.2d 626, *cert. denied,* —— U.S. ——, 131 S.Ct. 419, 178 L.Ed.2d 327 (2010) (citing *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). In deciding the existence *vel non* of a legitimate expectation of privacy, the court must determine whether the defendant possessed 1) "an actual (subjective) expectation of privacy in the item or place searched" and 2) whether "the expectation is one that society is prepared to recognize as reasonable." *Id. See also Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (establishing two-prong test); *Venner v. State*, 279 Md. 47, 51–52, 367 A.2d 949

---

**6.** The court also suggested that, even if the appellant had a legitimate expectation of privacy in the laundry room, the search nonetheless might have been reasonable under the exigency exception to the warrant requirement. We need not reach this issue.

**7.** The Fourth Amendment applies to the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

(1977) (adopting the *Katz* test). A legitimate expectation of privacy is one that has its source outside of the Fourth Amendment "either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

To support his contention that he had both an actual and objectively reasonable expectation of privacy in the common laundry room of the 657 Houston Avenue apartment building, the appellant relies, as he did below, upon *Garrison v. State, supra*, 28 Md.App. at 257, 345 A.2d 86. In that case, based on information from a confidential informant ("CI"), the police had reason to believe that Garrison was distributing heroin from the multi-unit apartment building in which he lived. Under police direction, the CI contacted Garrison to arrange a buy. At 2:35 a.m., the police and the CI arrived and entered the apartment building through the front door, which was not locked. From the first floor hallway, the police observed the CI knock on the door to Garrison's apartment and enter.

The police moved to a covert position in the basement of the apartment building, behind the stairs. The common laundry room for the apartment building was located in the basement, as were several other rooms. From their hiding place, the police saw Garrison enter the basement and unlock one of the basement rooms (not the laundry room), which was padlocked, using a key. He entered the room, disappearing from view, and reappeared after about a minute holding a tinfoil packet. He then returned to the first floor of the apartment building and was observed re-entering his apartment, where the CI had remained. The CI later provided the police the tinfoil packet, which contained heroin.

Based on their observations and the contraband provided by the CI, the police obtained a warrant to search the room in the basement they had seen Garrison enter. They sawed the padlock off of the door. Their search revealed a large quantity of heroin.

Garrison was charged with possession with intent to distribute heroin. Before trial, he moved to suppress the heroin from evidence, challenging the search of the room in the basement of the apartment building on the ground that the probable cause for the warrant "was only obtained by means of the prior alleged illegal entry [by the police] into the apartment building and its basement." *Id.* at 265, 345 A.2d 86. Evidence at the suppression hearing established that the apartment building was three stories, with approximately 13 apartments. Garrison's apartment was one of four on the first floor. The front door of the apartment building opened into a small vestibule and a four-step staircase led to a first-floor landing. Garrison's apartment was at the end of a narrow hallway off of this landing. In the vestibule adjacent to the stairway to the first floor was a door leading to a staircase to the basement of the building.

The resident manager of the apartment building testified that the front door to the apartment building was kept locked at all times. He, the tenants, and the building superintendent had keys to the front door. To gain entry to the building, guests of tenants had to call in advance and have the tenant unlock the front door. The front door did not lock automatically, however, so if tenants entered or exited and forgot to lock the door behind them, the door would be left unlocked.

The manager further testified that the door to the basement of the apartment building also was kept locked and, as with the front door, only he, the tenants, and the building superintendent had keys. The tenants were issued keys to the basement door so they could gain access to the laundry room. The other rooms in the basement were not for tenant use and, purportedly, were kept locked. The manager had not placed the padlock on the door to the room that the police had searched, however.

As of the date of the suppression hearing, a sign had been posted on the door to the basement stating that the laundry room was open from 7:30 a.m. until 9:30 p.m. There was no evidence that such a sign was present when the police entered the basement to conduct surveillance.

The court ruled that Garrison lacked standing to challenge the search because he had no right to be in the padlocked basement room. On appeal, we reversed. On the issue of standing, we reasoned:

At the time [Garrison] was observed in the basement at 2:35 A.M. he was, as the trial court held, "in a place he had a right to be", *i.e.*, he was "legitimately on the premises", in an area common to all tenants, but excluded to the public in general. The fact that a person does not have exclusive use or is not the only person who is legitimately on the premises is not a bar to his having standing to object to a search of that area. In *Mancusi v. De Forte*, 392 U.S. 364 [88 S.Ct. 2120, 20 L.Ed.2d 1154] (1968), the U.S. Supreme Court held that a union official had standing to object to a search of the offices where he worked even though it was an office shared by several union officials and even though the defendant did *not* claim the records were seized from an area set aside for his personal use. The Court relied on *Jones* [*v. United States* ], *supra* [362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (196) ], and *Katz v. U.S.*, 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967), and held that the capacity to claim the protection of the Fourth Amendment "depends not upon a property right in the invaded place, but upon whether the area was one in which there was a reasonable expectation of freedom from government intrusion." 392 U.S. at 368 [88 S.Ct. 2120].

In the circumstances, we hold that while [Garrison] was in the basement, except for the time he was in the large empty room, he had a reasonable expectation that he would be "free from governmental intrusion". The expectation was "reasonable" because he was "legitimately on the premises", with knowledge that the area was excluded from the public's presence and sight. [Garrison] met his burden of establishing his standing to object to the warrantless intrusion into the basement area.

*Id.* at 269–70, 345 A.2d 86.

This Court proceeded to conduct an independent analysis of the reasonableness of the police entry into the basement based

on the facts, which were undisputed. We explained that the police entered the building at 2:35 a.m. for the sole purpose of finding Garrison's hiding place for his drug stash and that they had not obtained permission from anyone to enter the building. Notwithstanding the established evidence that the doors to the apartment building and the basement were unlocked at the time, we concluded that there was "no evidence from which the police could have reasonably concluded that the building or its common hallways were open to the public at 2:35 A.M." *Id.* at 271, 345 A.2d 86.

In our analysis, we discussed *Eisenstein v. State*, 200 Md. 593, 92 A.2d 739 (1952). There, the police entered an unlocked front door to a small apartment building,[8] and observed from the common hallway Eisenstein exiting an apartment and "shoving lottery tickets into his pocket." *Id.* at 599, 92 A.2d 739. The police arrested Eisenstein, searched him, and seized the lottery tickets. Affirming Eisenstein's conviction for possession of lottery paraphernalia, the Court of Appeals reasoned that, if the police had a right to be in the common hallway of the apartment building, the arrest and search of the defendant was legal. Observing that there was no evidence that the entrance door ever was kept locked, the Court held that the police were legally in the common hallway of the apartment building as the building had a public entrance and the entrance door "was open to the public." *Id.* at 600, 92 A.2d 739.

In *Garrison*, we distinguished *Eisenstein* on the ground that, in that case, the front door to the apartment building never was kept locked and so the apartment building was open to the public at all times. We emphasized the manager's testimony that, to enter the apartment building in *Garrison*, guests had to call and have a tenant unlock the front door, and further emphasized the CI's testimony that he ordinarily called the defendant when he wanted to "com[e] over to 'Re–Up.'" 28 Md.App. at 272, 345 A.2d 86. We concluded that this

---

**8.** There was a lock on the door, but it was not locked when the police entered.

evidence supported a strong inference that, on the morning in question, the CI had called Garrison and advised him that he was coming to buy drugs; and that Garrison had unlocked the door in anticipation of the CI's arrival. (There also was some testimony in *Garrison* to suggest that the police, not the CI, actually had opened the front door to the building.)

This Court opined that, "under the circumstances, this was an illegal entry on th[e] part [of the police] for the expressed purpose of searching for evidence of crime against [Garrison]." *Id.* We further opined:

> Even if we were to assume the initial entry into the building was somehow lawful, there can be no doubt that the entry into the basement was not. Here again, the police concede they had no permission from anyone to enter the basement. There are cases, such as *Eisenstein, supra,* where courts have held it reasonable in certain circumstances for police officers to enter lobbys [sic] and common hallways of apartment buildings found to be used by the general public. No case has been cited to us and we have found none, holding that, absent consent or exigent circumstances, the police may make a warrantless search of a basement area closed to the public and to be used only by tenants of the building.
>
> From what we have said it follows that evidence concerning the observations of the police inside the apartment building in the early morning hours of June 30, 1973, should not have been admitted as evidence at the trial in chief or used to form the basis for the search warrant subsequently obtained.

*Id.* at 274, 345 A.2d 86.

The State asserts that *Garrison* is distinguishable on its facts.[9] We agree. With respect to the police entry into

---

9. Among its arguments, the State maintains that the appellant's status as a guest of Harkum, rather than as a tenant, distinguishes this case from *Garrison.* The appellant counters that his reasonable expectation of privacy, *vel non,* in the apartment and its common areas would not be diminished by reason of his status as a long-term overnight guest of

the apartment building itself, unlike in *Garrison*, the evidence in this case was that the front door always was unlocked. No keys were issued to tenants for this door. Before the time of the challenged entry, the police already had entered the apartment building twice to go to Harkum's apartment, on the third floor. There was no suggestion below that the police had had no right to enter the apartment building on those prior occasions. Thus, whereas in *Garrison* we opined that there was "no evidence from which the police could have reasonably concluded that the building or its common hallways were open to the public at 2:35 A.M." *id.* at 271, 345 A.2d 86, here the evidence supported the conclusion that the 657 Houston Avenue apartment building always was open to the public.

Moreover, in *Garrison*, the evidence was that the door to the basement ordinarily was locked. We emphasized in that case that the police had entered a "basement area" that was "closed to the public and to be used only by tenants of the building." In the instant case, the evidence was uncontradicted that the laundry room was on the first floor and its door always was unlocked. The lack of a keyed entry to this space and its location on a main floor provides further support for our conclusion that *Garrison* does not control the instant case.

Whether the appellant had a legitimate expectation of privacy in the common laundry room of the 657 Houston Avenue apartment building is best analyzed by reference to the relevant Maryland and federal case law that has developed in the more than 30 years since *Garrison* was decided. Of particular importance is *Fitzgerald v. State*, 384 Md. 484, 864 A.2d 1006 (2004), in which the Court of Appeals held that a canine sniff of an apartment door in a multi-unit apartment building was not a search under the Fourth Amendment. In reaching its holding, the Court had occasion to consider the propriety of

a tenant. We agree with the appellant on this point. *See, e.g., Ricks v. State,* 312 Md. 11, 25–27, 537 A.2d 612 (1988) (assuming without deciding that invitees of a lessee had standing to assert a Fourth Amendment challenge to a search of an apartment).

warrantless entries by police into common hallways of apartment buildings.

The relevant facts in *Fitzgerald* were as follows. A K–9 unit police officer, accompanied by his certified drug-sniffing dog, entered a multi-unit apartment building through "unlocked glass doors." 384 Md. at 488, 864 A.2d 1006. Two apartments and a staircase opened directly onto the vestibule and two more apartments opened onto a common hallway at the top of the staircase. The officer directed the dog to scan the vestibule and second-floor common hallway. The dog did so and alerted outside the defendant's apartment. Based in part on the positive canine sniff, the police obtained a search warrant for the defendant's apartment. The search conducted pursuant to the warrant revealed substantial amounts of marijuana.

After being charged with various drug offenses, the defendant unsuccessfully moved to suppress the contraband from evidence on the ground that the dog sniff was an illegal, warrantless search of his home. On appeal to this Court after conviction, we affirmed. *Fitzgerald v. State*, 153 Md.App. 601, 837 A.2d 989 (2003). The Court of Appeals granted *certiorari* and likewise affirmed. In holding that the canine sniff of the exterior of the apartment conducted from the common hallway of the apartment building was not a search within the ambit of the Fourth Amendment, the Court explained that, under prevailing United States Supreme Court law, "government tests, such as a canine sniff, that can reveal only the presence or absence of narcotics and are conducted from a location where the government officials are authorized to be, *i.e.*, a public place, are not searches." 384 Md. at 493, 864 A.2d 1006. The Court emphasized that the police directing the canine sniff must "lawfully be present at the site of the sniff." 384 Md. at 503, 864 A.2d 1006. In other words, contraband located inside an area for which a defendant has a legitimate expectation of privacy by means of a test conducted outside that area, in a place the police or government actors are permitted to be, is not a Fourth Amendment search.

The *Fitzgerald* Court had no difficulty concluding that the police officer and his dog were lawfully present in the hallway of the apartment building "as the apartment building's common area and hallways were accessible to the public through an entrance of unlocked glass doors." *Id.* at 504, 864 A.2d 1006 (citing *Eisenstein,* 200 Md. at 593, 92 A.2d 739). Because the canine sniff that detected the smell of drugs inside Fitzgerald's apartment was carried out in the common hallway of the apartment building, where the public, including the police, had a right to be, Fitzgerald's Fourth Amendment rights were not implicated, and therefore could not have been violated.[10]

---

**10.** The Court of Appeals observed that this Court's opinion, authored by Judge Moylan, was "thorough and well-written." 384 Md. at 489, 864 A.2d 1006. Judge Moylan had disposed of the issue with relative ease:

> One preliminary question can be disposed of summarily. It is a classic instance of the inapplicability of the Fourth Amendment because of the non-coverage of the place in which the challenged police activity occurred. On March 19, Officer Brian and Detective Grim, with Alex in tow, entered the apartment building designated as 3131 Normandy Woods Drive. It is a brick structure. Officer Brian described how the police team entered through glass doors into a common area that he characterized as a "vestibule." He explained that the "door is not locked" and that "you don't have to be buzzed in." Within that vestibule or common area were mailboxes and a stairwell leading to upper floors. On the main floor and accessible from that vestibule were Apartments A and B. Apartments C and D were "upstairs one flight of stairs." Officer Brian "believed there was another set of apartments on the third [level], up one more flight."

> \* \* \*

> We fully concur in [the suppression court's] ruling that the common area or vestibule of the apartment building was not a place enjoying Fourth Amendment protection. . . .

> \* \* \*

> In terms of the place covered by the Fourth Amendment, the outer boundary of the protected area was the property line of the apartment itself. Beyond that line, the vestibule of the apartment house was no different than a public street or an open field. The police needed no justification for being there. The Fourth Amendment being inapplicable in that place, the police could have been on the most baseless or random of fishing expeditions and it would be beyond our area of concern.

153 Md.App. at 663–67, 837 A.2d 989.

One year after its decision in *Fitzgerald*, the Court of Appeals held in *Whiting v. State, supra*, 389 Md. at 334, 885 A.2d 785, that a squatter in an abandoned building owned by the Housing Authority of Baltimore City did not have an objectively reasonable expectation of privacy in a room in which he was living, which he kept locked. Although the case did not involve the precise issue of common areas of apartment buildings, the Court's recitation of factors relevant to whether a person has an objectively reasonable expectation of privacy in a particular place is pertinent. The Court noted that these factors include "whether the individual [claiming an objectively reasonable legitimate expectation of privacy in a particular place] owned, leased, controlled, lawfully occupied, or rightfully possessed the premises searched." 389 Md. at 359, 885 A.2d 785.

With one exception, all of the federal courts of appeal that have considered whether tenants of multi-unit apartment buildings have an objectively reasonable expectation of privacy in the common areas of their buildings have held they do not. *See United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir.1998) (opining that "[i]t is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building" and concluding that the defendant did not have a reasonable expectation of privacy in the basement storage area of his apartment building); *United States v. Barrios-Moriera*, 872 F.2d 12, 14–15 (2nd Cir.1989) (holding that the defendant did not have a reasonable expectation of privacy in the apartment hallway of his building); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) (holding that there is no reasonable expectation of privacy in the hallway of an apartment building); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir.1977) (holding that there is no reasonable expectation of privacy in common hallways of a locked apartment building); *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir.1993) (holding that there is no reasonable expectation of privacy in apartment hallway despite locked entrance with buzzer system); *United States v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir.2002) (holding that

there is no reasonable expectation of privacy in the common area of a multi-unit apartment building without functioning locks).[11] In support of these holdings, the courts have reasoned that "tenants have little control over [common] areas, which are available for the use of other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers and the like." *Miravalles*, 280 F.3d at 1332.

We return to the case at bar. As in *Fitzgerald*, the 657 Houston Avenue apartment building was accessible to outsiders 24 hours a day. The front door was unlocked at all times; indeed, there was no evidence that tenants were issued keys to the front door and it appears that the door simply did not have a lock at all. To be sure, there was a sign on the front door that read: "NO TRESPASSING. NO LOITERING OR SITTING IN THE HALLWAY STAIRS, BY ADULTS, CHILDREN OR, GUESTS. VIOLATORS WILL BE ASKED TO MOVE WITHOUT NOTICE." In *Eisenstein*, 200 Md. 593, 92 A.2d 739, the Court of Appeals rejected an argument that officers who entered onto the common hallway of an apartment building where the front door was unlocked and mail was left for the tenants were "trespassers ... *ab initio.*" *Id.* at 600, 92 A.2d 739. The Court observed that the evidence, on the contrary, supported the conclusion that "it was the custom of everyone entering this apartment house to use this vestibule [otherwise described as the common hallway] as a public

---

**11.** In *United States v. Carriger*, 541 F.2d 545 (6th Cir.1976), the court held that a tenant in a multi-unit apartment building had a legitimate expectation of privacy in the stairway of the building. The building in question was locked and only could be accessed by a key or if the entrant was buzzed in by a tenant. The police managed to gain entry through the open door after several workmen exited the building. Once inside, they observed a suspected drug transaction that formed the basis of probable cause for their entry into an apartment in the building. The court held that, "when, as here, an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed." *Id.* at 552. This decision is on facts akin to *Garrison* and in any event preceded the trend of the law made clear in the subsequent decisions of the 1st, 2nd, 7th, 8th, 9th, and 11th circuit courts of appeal.

entrance and that this unlocked entrance door was open to the public." *Id.*

The presence of the "no trespassing" sign in this case does not distinguish it from *Eisenstein, Fitzgerald,* or any of the many federal circuit court cases holding that in most situations tenants of multi-unit apartment buildings do not have a legitimate right of privacy in the common hallways and areas of the buildings in which they live. Indeed, the Court's observations in *Eisenstein* apply here with equal force.

■ A trespass against property "occurs when there is interference in the exclusive possession of the land of another," either "by entering or causing something to enter the land." *Rosenblatt v. Exxon,* 335 Md. 58, 78, 642 A.2d 180 (1994). Tenants of the 657 Houston Avenue apartment building did not have exclusive possession of the common hallways of the building. Because the front door was unlocked, the hallways were readily accessible to visitors, repair people, delivery people, and anyone who wished to enter, including police officers. Moreover, the common areas of the building did not belong to the tenants; they belonged to the landlord. *See Hemmings v. Pelham Wood Ltd. Liability P'ship,* 375 Md. 522, 538, 826 A.2d 443 (2003) (common areas are "among the portions of a landlord's property over which it retains control" and a landlord may be held liable in tort for failure to maintain such areas in a "reasonably safe condition"). The import of the sign, given the custom, as in *Eisenstein,* for members of the public to enter the unlocked front door to access the common hallways, was to warn people who already had entered, but had no reason to be in the building or business to carry out, not to use the common areas as a place to "hang out."

The laundry room of the apartment building, like the front door, was not locked. It was on the first floor. It was accessible to tenants and their invitees, *see Miravalles, supra,* 280 F.3d at 1332; to the landlord and repair persons; and, as the facts of this case amply demonstrate, to anyone who entered the building through the unlocked main entrance.

None of the factors the *Whiting* Court found relevant to whether a person has an objectively reasonable expectation of privacy in a particular place militate in favor of such a finding with respect to the appellant and the common laundry room of the 657 Houston Avenue apartment building. He did not own the building, control its common areas, possess or have the right to possess, to the exclusion of others, the common areas; nor did he lease those areas or have a right to occupy or possess them to the exclusion of others.

As noted, the laundry room door bore a sign stating that it was "OPEN 8 A.M. TO 8 P.M." The police search of the laundry room did not take place within those hours. That makes no difference as to whether the appellant had a legitimate expectation of privacy in the laundry room. The room was not made physically inaccessible during those hours; it remained unlocked, and apparently did not have a lock at all. Given that nothing prevented entry into the laundry room during hours other than those posted on the sign, the likely purpose of the sign was to limit the times in which tenants would use the washers and dryers, so as not to create noise that would bother tenants within their individual units.

Under these circumstances, even if it could be said that the appellant had an actual, subjective expectation of privacy in the common laundry room of the 657 Houston Avenue apartment building (which the evidence did not support in any event), he did not have an objectively reasonable expectation of privacy in that room. As we have noted, to the extent the State maintains that the appellant's status as a temporary resident of Harkum's apartment meant that he had no reasonable expectation of privacy in any area of the apartment building, we disagree. He clearly had a reasonable expectation of privacy in the area of Harkum's apartment in which he was staying. However, for the reasons we have explained, neither he nor any resident of the apartment building had an objectively reasonable expectation of privacy in the common laundry room of the building.

The motion to suppress evidence of the gun recovered in the search of the laundry room of the 657 Houston Avenue apartment building was properly was denied.

## II.

### *Seizure of Pumphrey's Cell Phone*

The appellant next contends the circuit court erred in denying his motion to suppress from evidence Pumphrey's cell phone, as the fruit of a custodial interrogation improperly conducted prior to his receiving *Miranda* warnings.

At the suppression hearing, Detective Hoezel testified to the following relevant facts. When, in the early morning hours of December 1, 2009, Detective Hoezel and Corporals Erwin and Black arrived at Harkum's apartment with an arrest warrant for the appellant, Harkum let them in her apartment and they found the appellant sleeping on the floor in the bedroom. He was using two jackets as a pillow. After the officers confirmed his identity, the appellant was handcuffed and "placed [ ] in custody." He was wearing a pair of shorts and possibly a T-shirt. A search incident to arrest revealed $112 in cash and a small bag of marijuana in the pockets of his shorts.[12]

The police escorted the appellant out of Harkum's apartment, to the hallway of the apartment building, and Detective Hoezel informed him that he was going to be transported to the police station. At that point, the appellant asked the detective for "the rest of his clothes." Specifically, he asked for the "two black jackets" he had been using as his pillow and "a pair of gray pants." Detective Hoezel re-entered Harkum's apartment, returned to the bedroom, and located the clothing the appellant had described. He then returned to the hallway and showed the clothing to the appellant, who confirmed that it was his. Before giving the appellant the clothing to put on, Detective Hoezel searched the pockets of the jackets. According to the detective, it was "standard protocol [for] officer safety" to search any clothing that a suspect in custody would

---

12. Evidence of the marijuana was not introduced at trial.

be wearing. In the pocket of one of the jackets, Detective Hoezel found the appellant's ID and a cell phone. The cell phone matched the description of the cell phone stolen from Pumphrey.

The cell phone and clothing were processed as evidence. The appellant was advised of his *Miranda* rights after he was transported to the police station. He invoked his right to counsel and did not give a statement.

Detective Hoezel acknowledged in his suppression hearing testimony that, prior to arresting the appellant, he was aware that Pumphrey had described the clothing worn by his assailant as a "dark or a black jacket and gray pants." In Detective Hoezel's incident report, he noted that the clothes seized from the bedroom in which the appellant had been found when the warrant was executed "matched the original suspect description."

Defense counsel argued below that the police used the appellant's request for clothing as a pretext to locate and search a jacket and pants matching the description Pumphrey had given of the clothes his assailant was wearing. He further argued that Detective Hoezel's presenting him with the clothing retrieved from the bedroom in Harkum's apartment and asking him "are these your jackets" amounted to a custodial interrogation. Defense counsel asserted that, because the appellant had not been given *Miranda* warnings at that time, his statement confirming that the clothes belonged to him was the product of a custodial interrogation without prior *Miranda* warnings, and therefore should have been suppressed from evidence.[13] The motion court ruled that there was no *Miranda* violation.

■ "[A] criminal defendant claiming that *Miranda* is applicable (and that it, therefore, must be satisfied) must establish the two sub-elements of 1. CUSTODY, and 2. INTERRO-

---

**13.** Defense counsel also argued below that the search of the jacket violated the appellant's rights under the Fourth Amendment. He does not make that argument on appeal.

GATION as those two terms of art have been fleshed out by the extensive body of *Miranda* caselaw." *Smith v. State*, 186 Md.App. 498, 518, 974 A.2d 991 (2009), *aff'd*, 414 Md. 357, 995 A.2d 685 (2010). In the instant case, there is no dispute that the appellant was in custody when Detective Hoezel arrested him pursuant to a warrant, placed him in handcuffs, and removed him from the bedroom in Harkum's apartment to the hallway. It follows that if he was subject to "*actual* interrogation or the *functional equivalent* of interrogation" he would meet the threshold for the applicability of *Miranda*. *Prioleau v. State*, 411 Md. 629, 639, 984 A.2d 851 (2009).

"[I]t is well settled that the functional equivalent of interrogation can occur even if the defendant is not asked a single question." *Id.* at 646, 984 A.2d 851. This is so because an interrogation, for purposes of *Miranda*, "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted); *see Drury v. State*, 368 Md. 331, 793 A.2d 567 (2002) (functional equivalent of interrogation occurred when, before being given his *Miranda* warning, the defendant was placed in an interrogation room, shown evidence recovered from the crime scene and advised that these items would be tested for fingerprints). Volunteered statements are not protected under *Miranda*, however. *See Fenner v. State*, 381 Md. 1, 17, 846 A.2d 1020 (2004) ("voluntary statement or blurt" made by a suspect in custody not protected under *Miranda* ).

*State v. Conover*, 312 Md. 33, 537 A.2d 1167 (1988), is instructive. There, the Court held that a murder suspect who already had invoked his *Miranda*-based right to counsel was not subjected to the functional equivalent of interrogation when he was read a statement of charges, given a copy of the charges and the application upon which they were based, and was told, "read them, look at them, if you have any questions

ask them." 312 Md. at 37, 537 A.2d 1167. After reading the documents, the defendant said, "you can't put me with that .38." *Id.* The Court held that "[t]he police acted reasonably and lawfully, and the Respondent was not subjected to compelling influences, psychological ploys, or direct questioning. His volunteered statement was properly admitted." *Id.* at 45, 537 A.2d 1167.

In the case at bar, the appellant argues that the "act of showing the clothing to [him] for his identification constituted the 'functional equivalent of interrogation' requiring *Miranda* warnings." This is so, he maintains, because Detective Hoezel " 'knew or should have known that' his actions 'were reasonably likely to elicit an incriminating response' [from the appellant]—namely, that the clothes did indeed belong to [him]." The information was incriminating, according to the appellant, because Detective Hoezel knew that, upon receiving confirmation that the clothes belonged to the appellant, the clothes could be searched. The State responds that, although the appellant indeed was in custody, there was no interrogation and therefore suppression was not warranted. Moreover, the State asserts, even assuming *arguendo* that the evidence was recovered as a result of a custodial interrogation, suppression of the evidence would not be an appropriate remedy under the circumstances.

The evidence adduced at the suppression hearing compels the conclusion that, at the relevant time, there was no interrogation or its functional equivalent. As noted, when the appellant was taken by the police from the bedroom in Harkum's apartment to the hallway of the apartment building, he was clothed in shorts and possibly a T-shirt. Not surprisingly, given that it was December, he asked Detective Hoezel to retrieve clothes for him to wear to the police station. Detective Hoezel testified that the appellant specifically asked him to retrieve the two jackets he had been using as a pillow and a pair of gray pants. Detective Hoezel returned to the bedroom of Harkum's apartment and found clothing matching the description given by the appellant. When he returned to the

hallway, Detective Hoezel held the clothing up and the appellant volunteered that the clothes belonged to him.

We find no merit in the appellant's contention that, because Detective Hoezel knew that the clothing the appellant asked him to retrieve matched the description Pumphrey had given of the clothing worn by the robber, Detective Hoezel could not retrieve the clothing and allow the appellant to identify it as belonging to him without running afoul of *Miranda*. The appellant made a voluntary request for his clothing and then, when the clothing was brought to him, volunteered that it belonged to him. As in *Conover*, we have no difficulty in concluding that Detective Hoezel acted "reasonably and lawfully" in responding to the appellant's request as he did and in confirming that the clothing he had retrieved from an apartment shared by a number of people belonged to the appellant. Also as in *Conover*, the appellant was not "subjected to compelling influences, psychological ploys or direct questioning." There was no interrogation for *Miranda* purposes under the present facts and the motion to suppress properly was denied.[14]

### III.

### *Gun Evidence at Trial*

The appellant next contends the trial court abused its discretion in admitting the gun into evidence because the gun "lacked a sufficient connection to [the appellant] or the alleged crime." The State responds that it was for the jury—as the finder of fact—to weigh the credibility of the witness testimony regarding the gun and make its own determination as to whether the gun the police found in the laundry room of the

---

14. Because we conclude that *Miranda* was not applicable, we need not determine whether suppression of the cell phone would have been an appropriate remedy. We agree with the State, however, that suppression of the fruit of a *Miranda* violation is not a foregone conclusion. *See Pryor v. State*, 195 Md.App. 311, 326, 6 A.3d 343 (2010) ("[E]ven if there had been a *Miranda* violation, the fruit of the poisonous tree doctrine would not apply because *Miranda* violations are not constitutional violations.").

657 Houston Avenue apartment building was used by the appellant in the commission of the robbery.

As already discussed, the police found the gun in question lying on the floor behind a row of washing machines in the laundry room of the 657 Houston Avenue apartment building. It was a fully loaded, black, .38 caliber Colt revolver with black handles. It was mottled with rust on the muzzle and the handle.

After the court denied the motion to suppress the gun from evidence, the appellant filed a motion *in limine*, arguing that the gun evidence should be excluded at trial. The motion was argued on the first day of trial, before jury selection. Defense counsel asserted that there was no physical evidence linking the gun to the appellant,[15] and, because the gun had not been found in the appellant's possession, there was absolutely no evidence to connect the weapon to the appellant. Moreover, according to defense counsel, the gun did not match the descriptions given by Pumphrey.[16]

The State responded that the appellant's argument went to the weight, not the admissibility, of the gun evidence. The State proffered that it would produce evidence at trial that Amankwah told police that she saw the appellant with a gun prior to the robbery and that she told police that the gun might be in the laundry room of the 657 Houston Avenue apartment building.

The court denied the appellant's motion *in limine*, stating:

I think it's a reasonable inference that a robbery victim isn't trying to remember the description of a gun. And the descriptions that typically are given of guns are tentative at

---

**15.** The gun was dusted for fingerprints, but no useable prints were recovered. The gun also was swabbed for DNA testing. The parties stipulated at trial that "the amount of DNA sample was insufficient to give a full profile for comparison purposes."

**16.** At first, Pumphrey told the police that the gun was black, with brown handles. At the suppression hearing, he testified that the gun was silver with a brown handle.

best, to expect that someone who's being robbed is going to be able to give a detailed description of a gun.

This case is distinguishable from the *Burleson* case.[17] And, particularly, in *Burleson*, the gun that was recovered, it was recovered five hours after the alleged assault had occurred, and it was not recovered within the neighborhood where the assault occurred; it was recovered some distance away. And the court said that that would be pure conjecture to admit a gun with these facts, and try to connect that gun to the defendant.

This gun was found in the very building where the incident was alleged to have occurred,[18] and it was also found as a result of a witness, who, whether you find that witness credible or not, obviously wasn't a guess, because the gun was where a witness said that the gun would be.

\* \* \*

If evidence is relevant and it's material, it's admissible. It's relevant because the alleged robbery in this case occurred with a gun. And it's material if the jury believes that this is the weapon that was used or could have been used.

And so for those reasons, the motion to exclude the weapon is denied.

During trial, the State introduced into evidence the gun and bullets; two photographs of the gun lying behind the washing machine where it was found; and two close-up photographs of the gun and its loaded chamber. Defense counsel noted timely objections at each juncture.

---

**17.** *Burleson v. United States,* 306 A.2d 659 (D.C.1973).

**18.** As the appellant points out, this was an incorrect statement. The gun was found in the 657 Houston Avenue apartment building where the appellant was staying, not in the 8118 Roanoke Avenue apartment building where the robbery occurred. Defense counsel clarified this with the trial judge during argument. The trial judge responded that the two buildings were "close in proximity," and reiterated that the instant case was "clearly distinguishable from the *Burleson* case."

On direct examination, Pumphrey testified that he had described the gun used as a "silver gun with a brown handle" and that it "looked like" a .38 caliber. He was shown the gun recovered by the police, but did not positively identify it.[19] Thereafter, defense counsel renewed his motion to exclude the gun from evidence, arguing that "[t]here's not going to be any evidence to tie that gun, that the State says is the gun, to [the appellant]. None." The renewed motion was denied.

On cross-examination, Pumphrey acknowledged that the gun recovered by police was rusty and that he had not described the gun used in the robbery as being rusty.

Amankwah testified on direct examination that the appellant had told her that he "pulled a gun" on Pumphrey. She further testified that she had seen the appellant with a gun in the past, but she could not recollect when. She acknowledged telling the police that she had seen the appellant with a gun with a "black long nozzle with brown handle" on the evening of the robbery. She also claimed that she did not remember telling the police that the gun might be found in the laundry room of the Houston Avenue apartment building. Amankwah was not asked to identify the gun found by the police.

The police witnesses each positively identified the gun as the one recovered from the laundry room. Detective Hoezel also testified that Amankwah had told him the appellant had a gun and that the gun might be in the laundry room.

 "A trial judge's decision to admit or exclude evidence will not be set aside absent an abuse of discretion." *Gerald v. State*, 137 Md.App. 295, 304, 768 A.2d 140 (2001). Evidence is admissible if it is " 'relevant to the issues' " in the case and " 'tend[s] either to establish or disprove them.' " *Dorsey v. State*, 276 Md. 638, 643, 350 A.2d 665 (1976) (quoting *Kennedy v. Crouch*, 191 Md. 580, 585, 62 A.2d 582 (1948)). "The determination of whether evidence is relevant, *vel non*, is

---

**19.** Pumphrey was shown the gun and asked if he "recognize[d]" it. He replied, "I'm looking at it." He never was directly asked on direct or cross-examination whether the gun recovered by the police was the gun used by the appellant.

committed to the sound discretion of the trial court." *Lee v. State,* 193 Md.App. 45, 75, 996 A.2d 425, *cert. denied,* 415 Md. 339, 1 A.3d 468 (2010) (citing *Merzbacher v. State,* 346 Md. 391, 413, 697 A.2d 432 (1997)).

In *Aiken v. State,* 101 Md.App. 557, 573, 647 A.2d 1229 (1994), a case relied upon by the appellant, we affirmed a trial court's denial of a motion to exclude evidence of a gun. There, the defendant had been charged with rape and two counts each of armed robbery and use of a handgun in the commission of a crime of violence. When the defendant was arrested, a gun was found in close proximity. A holster for the same type of gun was found in the defendant's apartment. While both victims testified at trial that the gun was of a similar type as the one used, neither could positively identify it. In denying the motion to exclude evidence of the gun, we opined that " 'physical evidence need not be positively connected with the accused or the crime to be admissible; it is admissible where there is a reasonable probability of its connection with the accused or the crime, the lack of positive identification affects only the weight of the evidence.' " (Quoting *Brooks v. State,* 24 Md.App. 334, 344, 330 A.2d 670 (1975).)

In the instant case, the appellant asserts that the State failed to demonstrate even a "reasonable probability of [the gun]'s connection with [the appellant]." *Id.* We disagree. The State produced evidence that the appellant was seen with a revolver style handgun prior to the crime; that the appellant used a .38 caliber revolver style handgun to commit the crime; and that a .38 caliber revolver style handgun was found in the laundry room of the apartment building where the appellant was living. Moreover, the evidence was that the laundry room was searched because Amankwah told police that the appellant may have hidden his gun in that location. Both Amankwah and Pumphrey described the gun as being black, although Pumphrey also described it as silver. This evidence was sufficient to create a "reasonable probability" that the gun was connected to the appellant.[20] It was for the jury to weigh the evidence and make the ultimate determination on this point.[21]

---

**20.** The jurors, in fact, rejected this evidence and acquitted the appellant of all of the gun related charges.

## IV.

### *Missing Evidence Instruction*

Finally, the appellant contends the trial court abused its discretion by declining to give a missing evidence jury instruction respecting Pumphrey's cell phone. The State counters that this issue is not preserved for review and, in any event, the instruction was not warranted.

Prior to the appellant's arrest, Pumphrey provided the police a description of his cell phone. It was a Motorola Boost model. This type of cell phone allows its user to purchase minutes as needed, rather than through a contract with a wireless service provider. Pumphrey gave police his cell phone number and also told them that the home screen on the phone displayed the logo for the Dallas Cowboys.

After Detective Hoezel recovered the cell phone from the appellant's jacket pocket, he confirmed that the phone number matched the number provided by Pumphrey and that the phone displayed the Dallas Cowboys image. Pumphrey was shown the phone and positively identified it as belonging to him. The phone was photographed at the police station, but was not otherwise analyzed for evidence.[22]

---

**21.** The appellant also relies on several out of state cases excluding evidence of weapons based on an insufficient connection between the weapon and the defendant. In *Burleson v. United States, supra,* 306 A.2d 659, the evidence linking a gun to the defendant was a witness's testimony that he was "reasonably sure" it was used in an assault and that the gun was found beneath the passenger seat of the defendant's brother's car shortly after the defendant had been a passenger in that car. *Id.* at 660. The *Burleson* court held that the trial court erred in denying a motion to exclude evidence of the gun. Even if we found the *Burleson* court's reasoning persuasive, which we do not, the case is distinguishable. Here, Amankwah's statement to the police that the gun might be in the laundry room provided a nexus between the gun and the appellant that was lacking in *Burleson*.

**22.** One photograph depicted the Dallas Cowboys logo on the phone. Two other photographs showed the front and back of the phone.

Prior to trial, the appellant filed numerous discovery requests seeking access to the cell phone to recover "potentially exculpatory or impeachment information." On May 25, 2010, less than a month before trial, the appellant discovered that the phone no longer was in police custody. Detective Hoezel had returned the phone to Pumphrey a "couple days" after police had recovered it. Pumphrey had asked to be given the phone because he needed to use it for his job.

The appellant moved to dismiss the indictment, exclude evidence of the phone at trial, or for an instruction on spoilation as a remedy for what he asserted was bad faith on the part of the police. He argued that voice mail messages, text messages, and contact information stored on the internal memory of the phone "could have shown that the cell phone had been rightfully in the possession of [the appellant] for some time and, likewise, not in the possession of Mr. Pumphrey [on the night of the robbery]." He also asserted that the phone could have been tested for fingerprints and that "[t]he lack of [the appellant]'s fingerprint on the phone also would have been exculpatory."

After hearing argument on the motion on the first day of trial, the court ruled that, although the appellant possibly could be entitled to argue to the jury that the cell phone should have been made available to him and that the jurors should draw a negative inference from the fact that the phone was not maintained in evidence, he had failed to demonstrate any bad faith on the part of the police. Accordingly, his motion to dismiss and to exclude evidence of the phone were denied.[23]

At trial, the State introduced into evidence the photographs of the cell phone and Pumphrey testified that the phone depicted in the photographs belonged to him and was the phone stolen from him on November 30, 2009. He further

---

23. The appellant does not challenge on appeal the denial of his motion to dismiss or exclude the evidence on appeal.

testified that he no longer was in possession of the phone, having lost it on the bus a few days before trial.

Detective Hoezel testified that the cell phone was booked as evidence after it was recovered from the appellant's jacket. He explained that decisions whether to release stolen property held as evidence to its owner are made on a "case by case basis." He acknowledged, however, that, under TPPD procedures, the release of evidence is to be documented on the property form. He did not document the release of the cell phone to Pumphrey, however. Finally, Detective Hoezel testified over objection that text messages and phone call history from a cell phone would be available to anyone who chose to subpoena those records.

The appellant asked the court to give Maryland Civil Pattern Jury Instruction ("MPJI–CV") 1:10, which states:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

The court declined to give the requested instruction, concluding that it was not generated by the evidence. It emphasized that there was no evidence of bad faith on the part of the police or the State and that the appellant's argument that the cell phone may have contained exculpatory information was "pure speculation."

▉ "We review a trial judge's decision whether to give a jury instruction under the abuse of discretion standard." *Thompson v. State,* 393 Md. 291, 311, 901 A.2d 208 (2006). Pursuant to Rule 4–325(c), the court

> may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instruc-

tions are binding. . . . The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Recently, in *Gimble v. State,* 198 Md.App. 610, 18 A.3d 955, *cert. denied,* 421 Md. 193, 25 A.3d 1026, 2011 Md. LEXIS 543 (Aug. 15, 2011), we discussed the two leading Maryland cases concerning missing evidence jury instructions:

In *Patterson* [*v. State,* 356 Md. 677, 741 A.2d 1119 (1999)], the defendant was arrested during a traffic stop when police determined that his driver's license had been suspended. During an inventory search of his vehicle, the arresting officer found in the trunk a dirty jacket with a plastic baggie in one of the pockets. Inside the baggie were a number of individually wrapped rocks of crack cocaine. The police did not collect the jacket as evidence and no one knew what became of it. The defendant was charged with possession of cocaine with intent to distribute. At trial, the defendant asked the court to give the jury a missing evidence instruction, telling them that they could infer from [t]he fact that the jacket was not collected by the State that its admission into evidence would have been adverse to the State's case. The trial court declined to give the requested instruction. The defendant was convicted.

The case ultimately was decided by the Court of Appeals, which affirmed the judgment of conviction. First, as in this case, the Court in *Patterson* rejected the defendant's argument that the State had violated his due process rights by failing to collect the jacket. Recognizing that due process under the Maryland Declaration of Rights is *in pari materia* with the Due Process Clause of the Fourteenth Amendment, the Court applied the bad faith test as established in *Youngblood.*[24] It concluded that the defendant had offered no evidence that the State had intentionally suppressed or destroyed the jacket; indeed, *no evidence was adduced to* show that the police had considered the jacket to have had

---

24. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

any evidentiary value at all. The Court determined that, at most, the failure of the police to seize and retain the jacket as potentially exculpatory evidence might have constituted negligence, which does not amount to bad faith under *Youngblood*.

Second, the *Patterson* Court rejected the defendant's argument that the trial court's refusal to grant a missing evidence instruction violated his due process rights. The Court held that, although an adverse inference may be drawn from the destruction of evidence, against the party who destroyed the evidence, an instruction on such a factual inference is not required to be given. Counsel is permitted to argue the adverse inference to the jury, but a jury instruction about the inference need not be given.

In *Cost* [*v. State,* 417 Md. 360 (2010) ], the defendant was charged with crimes stemming from the stabbing of a fellow prisoner at the Maryland Correctional Adjustment Center ("MCAC"). The stabbing took place in a prison cell. After the attack, Major Donna Hansen, the investigative officer, did not collect any evidence from inside the prison cell. On the night of the attack, she telephoned the Department of Public Safety and Correctional Services' Internal Investigative Unit ("IIU"). Five days later, she spoke to a detective with the IIU, telling him that the cell was sealed and asking that the IIU release the cell. Thereafter, a detective from the IIU went to MCAC to investigate the matter, but could not examine the cell because it already had been cleaned and no physical evidence from it had been preserved. The victim's clothing was not accepted by the IIU's crime lab because of its age and the lack of chain of custody. *Id.* at 367, 10 A.3d 184.

At trial, the court denied the defendant's request for a missing evidence instruction, reasoning that there was nothing to show that the State deliberately had destroyed the evidence. After the defendant was convicted of reckless endangerment, he appealed. Ultimately, the Court of Appeals reversed, holding that the trial court had abused its

discretion by not granting the requested instruction. In doing so, the Court distinguished *Patterson.*

The *Cost* Court recognized that *Patterson* remains good law, insofar as it holds that Maryland's due process constitutional protections do not extend beyond *Youngblood,* but concluded that the decision left open the question of what substantive Maryland evidence law requires. Remarking that *Patterson* held that trial courts *ordinarily* need not instruct the jurors on *most* evidentiary matters, the Court reasoned that *Patterson* did not establish an absolute rule, and that exceptions could be found. The Court observed that the unusual facts in *Cost* stood "in stark contrast to those in *Patterson.*" *Id.* 417 Md. at 380, 10 A.3d 184. Whereas the jacket in *Patterson* was never collected as evidence, and was not likely to have been used as evidence had it been collected, the crime scene in *Cost* had been sealed off from use pending investigation and the items held in the cell (for example a blood-stained linens and clothing, dried blood on the floor, and the victim's clothing) were of a type that ordinarily would be collected and analyzed. In fact, the clothing eventually was submitted for testing, but was rejected because it had not been timely submitted and because its chain of custody had not been preserved.

The *Cost* Court held that the evidence that was destroyed went to the heart of the defendant's case, and that merely allowing counsel to argue the adverse inference from the destruction of evidence would be insufficient to ensure that the interest of justice was protected. Under those exceptional circumstances, the trial court was required to instruct the jury that it could infer that the evidence that was destroyed was unfavorable to the State. The Court took care, however, to explain that its holding "does not require a trial court to grant a missing evidence instruction, as a matter of course, whenever the defendant alleges non-production of evidence that the State might have introduced." *Id.* at 382 [10 A.3d 184]. A trial court only will abuse its discretion in denying a request for a missing evidence instruction if " 'the jury instructions, taken as a

whole, [do not] sufficiently protect the defendant's rights' and 'cover adequately the issues raised by the evidence.'" *Id.* (alteration in original) (quoting *Fleming v. State,* 373 Md. 426, 433, 818 A.2d 1117 (2003)). When destroyed evidence was not central to the defense case, was "not the type of evidence usually collected by the state, or [was] not already in the state's custody . . . a trial court may well be within its discretion to refuse" to give a missing evidence instruction. *Id.*

198 Md.App. at 627–30, 18 A.3d 955.

In *Gimble,* we concluded that a missing evidence instruction was not mandated under the exception created in *Cost.* There, the defendant was observed speeding. A police officer attempted to effect a traffic stop, but the defendant sped off. During the ensuing chase, the defendant crashed his vehicle in a field. The police officer observed items falling from the car during the crash. A backpack was recovered by police a short distance from where the crash occurred. Inside the backpack were marijuana, cocaine, drug paraphernalia, and personal items. The defendant was charged, *inter alia,* with possession with intent to distribute marijuana and cocaine.

Before trial, the defendant sought access to the backpack, but was informed that the backpack, along with other evidence, had mistakenly been destroyed during a routine purge of the evidence room. The defendant moved to dismiss the indictment, arguing that the destruction of evidence violated his due process rights. His motion was denied. At the eventual trial, the defendant requested that the court instruct the jurors that, if they found that the State destroyed evidence, they could infer from that fact that the evidence destroyed was unfavorable to the State's case. The trial court declined to give the instruction.

On appeal to this Court, the defendant argued that the evidence in question—the backpack found to contain drugs and its contents and certain photographs of the crash scene depicting the location of the backpack—was central to the

defense case and, accordingly, fell squarely within the *Cost* exception to the general rule that the court need not instruct the jury on evidentiary inferences. Specifically, he argued that a cell phone charger in the backpack could have been tested for fingerprints and compared to cell phones found in the defendant's possession to determine if it was compatible. He asserted that evidence that the charger was not compatible with his phones or that fingerprints of another individual were on the charger would tend to exculpate him because it would suggest that backpack belonged to someone else.

We disagreed, concluding that the destroyed evidence "was not critical to the defense and was not of a sort that usually would be subjected to forensic testing." 198 Md.App. at 631, 18 A.3d 955. We opined that even if fingerprint evidence had been collected, for instance, and was favorable to the defendant, it still would not have negated the evidence against him, *i.e.,* that he was in possession of the drugs and that he was in possession with intent to distribute them. We also emphasized that there was evidence presented at trial that it would have been highly unlikely that useable fingerprints could have been recovered from the backpack itself or its contents. Thus, while the evidence at issue certainly was "potentially useful" to the defense, it was not "central" to the defense case nor of the type ordinarily "subjected to forensic testing." *Id.* at 631–32, 18 A.3d 955. Thus, we determined that the trial court did not abuse its discretion in declining to give the requested instruction.

 We return to the case at bar. As an initial matter, the State contends that this issue is not preserved for review because the appellant requested a civil pattern spoilation instruction rather than a missing evidence instruction. We conclude that the point of error is properly before us. MPJI–CV 1:10 included language to the effect that the jurors could, but were not required to, draw a negative inference from the fact that evidence had been destroyed. This is precisely the type of instruction that the *Cost* Court held was required

under the unique facts of that case.[25] We turn now to the merits of the appellant's argument.

 Here, as in *Gimble,* we conclude that the evidence in question—the cell phone recovered from the appellant's jacket pocket—was neither central to the defense case nor of the type ordinarily subjected to forensic testing. After the phone was seized from the appellant's jacket pocket, the police confirmed that it matched the description provided by Pumphrey and photographed the phone to preserve a record of certain of its identifying features. Then, in response to Pumphrey's request, the phone was returned to him. The appellant did not present any evidence below that the TPPD ordinarily would have preserved the phone or examined the voice mail and text messages prior to returning it to its rightful owner.

The evidence the appellant argued to the trial court could have been obtained from the cell phone was evidence tending to show that the phone was in the appellant's possession prior to November 30, 2000.[26] He suggested to the trial judge that, for example, a voice mail left "for Antwan" or a text message sent to or from him prior to the night of the robbery could have proved that the phone was not stolen from Pumphrey. The State characterizes this argument as "far-fetched." We agree. Moreover, much of the same information the appellant sought from the phone could have been obtained through

---

**25.** *Cost* was decided after the trial in this case. The *Cost* Court quoted MPJI–CV 1:10 in its discussion of the doctrine of spoliation generally. It later noted that the instruction requested by the defendant was based on Maryland Criminal Pattern Jury Instruction ("MPJI–CR") 3:29, which was a "Missing Witness" instruction. It emphasized that it was not holding that MPJI–CR 3:29 "best encapsulates the doctrine of spoliation in this context" and that "various formulations of the instruction could satisfy the requirements of [its] holding." 417 Md. at 381–82 n. 10, 10 A.3d 184.

**26.** On appeal, the appellant advances additional arguments as to how information stored on the internal memory of the phone could have been useful to him at trial. We consider only those arguments raised below, however.

subpoenas for records documenting the calls that had been made.

Also, like in *Gimble,* even if fingerprint evidence had been collected from the cell phone, it is not clear how this evidence could have exculpated the appellant. If the appellant's fingerprints were present, this would not prove that he lawfully was in possession of the phone. If his fingerprints were not present, this also would not negate the evidence that the phone was found in his jacket pocket shortly after the robbery. Similarly, the absence of Pumphrey's prints would not prove that the phone did not belong to him.

For all of these reasons, the cell phone was not the type of evidence necessitating a missing evidence instruction and the trial court did not abuse its discretion in declining to give such an instruction.[27]

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**27.** Below and in this Court, neither party mentions Rule 4–263(d), regarding information the State must provide to the defense in discovery without a request. We make no comment as to that Rule's relevance *vel non* to this last issue.